Jayson WILKENFIELD, Plaintiff,

v.

James L. POWELL, et al., Defendants.

Civ. A. No. A–83–CA–86.

United States District Court,
W.D. Texas,
Austin Division.

Dec. 19, 1983.

Mark Cohen, Austin, Tex., for plaintiff.

Evelyn Tatum, Asst. Atty. Gen., Lee Smith, Austin, Tex., for defendants.

## MEMORANDUM OPINION

JACK ROBERTS, Senior District Judge.

Plaintiff Jayson Wilkenfield brought this suit pursuant to 28 U.S.C. §§ 1343 & 1331 and 42 U.S.C. § 1983, alleging a violation of his rights to due process of law. Wilkenfield, a former graduate student at the University of Texas at Austin, contends that he was unlawfully dropped from a doctoral degree program in psychology. Defendants are the Board of Regents of the university and Martin Manosevitz, a member of the psychology department faculty.

This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised hereby makes the following findings of fact and conclusions of law as required by Federal Civil Procedure Rule 52:

## FINDINGS OF FACT

Wilkenfield entered the doctoral program in July 1975. The graduate catalogue [*Catalogue*] for that year states that a student is bound only by the requirements of the catalogue in force at the time of admission. It states further, "No official time limit has been imposed on acquiring the doctoral degree ...."

The catalogue describes the organization of the Graduate College. Administration of the college is the responsibility of the Dean of Graduate Studies. *Catalogue* 9. A committee on graduate studies in each department and the Graduate Dean are responsible for supervising all course offerings and the programs of individual graduate students. *Id.* The members of the graduate faculty in each department constitute the department's committee on graduate studies. *Id.*

The catalogue makes each student responsible for acquainting himself with his department's specific requirements, either through correspondence or personal interviews. *Id.* at 14. The student is likewise responsible for knowing regulations in regard to the standard of work required to continue in graduate school. *Id.* at 15. Until a student has a supervisory committee, he is under the direction of the committee on graduate studies in his area. Finally, in order to obtain a doctoral degree, a student must first be admitted to candidacy on the recommendation of the committee on the basis of written or oral qualifying examinations or such other means as the committee may specify. *Id.* at 24.

The catalogue sets forth the requirements of a degree in psychology only in the most general terms. *Id.* at 191. It states that in addition to completing appropriate courses, "the department's general requirements include demonstration of competence in an area of specialization." *Id.*

The organization of the psychology department is described in a department publication, "Information for Clinical Graduate Studies," [*Information*] published in 1980. Members of the graduate faculty make up the graduate studies committee. *Information* 1. The power of that committee has been delegated to several area committees. *Id.* at 2. "Area committees were developed for the purpose of planning the curriculum for graduate students in that area, evaluating their training *and setting additional requirements* ...." *Id.* at 4 (emphasis added). An Executive Committee serves, among other functions, as a "court of appeal" to resolve disputes between a student and a faculty member or committee. *Id.* at 3. The organization of the department, in conjunction with the graduate catalogue provisions cited above, empower the area committees within the psychology department to supervise the programs of individual graduate students.

Wilkenfield's letter of admission to the doctoral program in clinical psychology states as a condition of his admission that he had to satisfy "[a]ny requirements of the department." It remains unclear

whether the admitting authorities intended this condition to last throughout Wilkenfield's tenure in the graduate program or whether they intended it to be probationary only. In any case, no specific formal requirements had been promulgated by the department. According to testimony, however, the faculty had made it clear that the department expected all doctoral students to progress satisfactorily through several stages of the program.

At that time, the faculty relied on informal communications with the students to apprise them of the design of the program and the performance expected of them. This was in accordance with the provisions of the graduate catalogue cited above. In September 1977, the department issued a description of its procedures and policies for evaluating graduate students that was based on its past practices [*Procedures*]. In regard to students who had passed their first year, the statement of procedures provided, "After the first year, standards for the successful completion of Area and Departmental requirements are specified by the student's Area Committee." *Procedures* 2. This statement clearly establishes the authority of the area committees to impose requirements on graduate students in order to determine their competence to continue in the program and obtain a degree.

As a consequence of his performance in the first-year (1975–76) courses, Wilkenfield was put on probation. He did additional work and was taken off probation. Wilkenfield took the second-year (1976–77) examinations. Although he did well on one part of the examinations, he was again required to do additional work because of his poor performance on another part. Wilkenfield completed that work in fall 1977, but did not register for courses for the next three semesters.

In August 1979, Wilkenfield began a half-time internship at the university's counseling center that was to continue for two years. In October 1979, the Clinical Training Committee (CTC), which is the area committee for clinical psychology students, reviewed the work and progress of its graduate students, including Wilkenfield. Martin Manosevitz, the director of the clinical training program and chairman of the CTC, notified Wilkenfield that it was the CTC's "hope and expectation" that he complete the preliminary orals on his dissertation by the end of the spring 1980 semester.

Wilkenfield made no apparent progress towards admission to candidacy during the 1979–80 academic year. Therefore, in May 1980 the CTC notified Wilkenfield by a letter from Manosevitz that he had to pass his preliminary orals by December 1, 1980, or he would be "automatically dropped from the program." In order to take preliminary orals, a psychology student must first write a proposal for a dissertation topic and choose a committee to supervise the dissertation. The topic and the committee must be approved by the area committee and the Executive Committee.

The provisions in the graduate catalogue and the information distributed by the psychology department quoted above authorize the CTC to require a student in the clinical training program to pass the preliminary oral examinations by a specified date. Such a requirement does not violate the general statement in the graduate catalogue that there is no official deadline for obtaining a doctoral degree, because it does not impose a deadline for obtaining a degree. Rather, the CTC merely requires students in its program to demonstrate continual progress towards obtaining a degree. Such a requirement is reasonable because of the limit on the number of students that the clinical program can handle at one time and the resulting need to use the department's resources productively. Moreover, it is a fair and practical way of requiring students to demonstrate "competence in an area of specialization," which the graduate catalogue sets forth as the department's general requirement.

Although Wilkenfield worked with a professor after receiving the May 1980 letter, by fall 1980 he had done little more than formulate a dissertation topic. In November 1980, just before the deadline, Wilkenfield told Manosevitz that "personal diffi-

culties" prevented him from making as much progress as the CTC was demanding. Manosevitz at that time suggested that Wilkenfield take a leave of absence, which would have suspended the deadline, but Wilkenfield declined to do so. At the suggestion of Manosevitz, Wilkenfield discussed his situation and plans with other members of the CTC.

Wilkenfield missed the deadline, and on December 9, 1980, the CTC voted to terminate him as a student in the clinical training program. The CTC voted also to recommend to the Executive Committee that Wilkenfield be dropped from the psychology program. The CTC's decision was based on Wilkenfield's performance in his courses, reports of his performance in the internship program, and the personal impressions that the various members of the CTC formed from talking to him. Although Manosevitz wrote to Wilkenfield that his personal difficulties were a major factor in the decision to drop him, the personal difficulties were considered only to the extent that they affected Wilkenfield's ability to perform as a psychologist.

The Executive Committee, however, did not accept the CTC's recommendation to drop Wilkenfield. Instead, it permitted him to register for the spring 1981 semester on the condition that he resign his internship. In addition, it set a deadline of May 15, 1981, for Wilkenfield to pass a preliminary oral examination.

Wilkenfield failed to meet the new deadline, and the Executive Committee voted unanimously to drop him from the graduate program in psychology. The action allowed Wilkenfield to remain a student in good standing in the graduate school. Wilkenfield appealed the committee's decision to the chairman of the department, who appointed an ad hoc panel of faculty members to act as a grievance committee. The grievance committee interviewed Wilkenfield and the department's graduate advisor. In August 1981, it issued a 26-page report, supporting the Executive Committee's action by a 3 to 2 vote.

In accordance with university regulations, Wilkenfield then appealed to the dean of the graduate school. The dean appointed an ad hoc committee of three members of the university faculty. This committee met with Wilkenfield and various members of the psychology department. In October 1981, the committee unanimously recommended that the action of the psychology department be upheld, and the dean followed that recommendation.

For reasons that remain unclear, Wilkenfield took no further action until September 1982, at which time he filed an appeal with the university president. On the basis of the record, the president sustained the dean's and the department's actions. Thereupon, Wilkenfield filed an action in this Court, seeking judicial review of the final decision of the university.

Wilkenfield's complaint assails the university's actions as violative of his right to obtain a doctoral degree under the rules of the university as set forth in the graduate catalogue. He argues that because the faculty of the psychology department and university officials failed to comply with established procedures of the university, their actions were "per se" arbitrary and capricious. Wilkenfield argues further that since his right to a degree is a property right, the defendants' arbitrary and capricious actions violated his fourteenth amendment right to due process. Furthermore, according to Wilkenfield, his dismissal was based wholly or in part on nonacademic grounds, that is, the "personal difficulties" referred to by Manosevitz. Finally, Wilkenfield alleges that Manosevitz acted "maliciously and in reckless disregard" of his constitutional rights.

Wilkenfield asks for injunctive relief to permit him to continue in the clinical training program at the university. In addition, he seeks $10,000 damages from Manosevitz.

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter and the parties to this suit in accordance with 28 U.S.C. § 1343.

■ In *Board of Curators v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court held that due process did not require a hearing where a student was dismissed from medical school on academic grounds. The fact that the determination was based on the student's clinical ability did not change the nature of dismissal from an academic to a disciplinary one. *Id.* at 87, 98 S.Ct. at 953. Thus, absent a stigma to the plaintiff's reputation, *Greenhill v. Bailey*, 519 F.2d 5 (8th Cir.1975), a decision to dismiss a student for failure to attain academic standards will not be disturbed by the courts unless the decision is motivated by bad faith or ill will unrelated to academic performance, *Stevens v. Hunt*, 646 F.2d 1168 (6th Cir. 1981), or the decision was based on arbitrary and capricious factors not reasonably considered to be academic criteria. *Ewing v. Board of Regents*, 559 F.Supp. 791 (E.D. Mich.1983).

■ Although courts, as a general proposition, have shunned interfering with the decisions of universities, if a student alleges that he was actually expelled for reasons other than the quality of his work or because of the bad faith or arbitrary and capricious action of an instructor, the courts will grant a hearing. Thus, Wilkenfield's assertions of due process denial attendant to the action of the university were sufficient to survive the defendants' motion to dismiss. Fed.R.Civ.P. 12(b)(6); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1969).

■ Wilkenfield stresses Manosevitz's letter of December 10, 1980, in which the professor states that Wilkenfield's personal difficulties were a major factor in the CTC's decision. He contends that this and other evidence in the record show that the CTC's decision was based largely on nonacademic factors. The Court is compelled to state that it feels inadequate even to determine what constitutes academic factors in deciding whether a student would be a competent clinical psychologist. This evidence in this case is clear enough, however, for this Court to find that nonacademic factors played little or no part in the decision to dismiss Wilkenfield.

Furthermore, the university catalogue that Wilkenfield put into evidence made him responsible for knowing the unpublished requirements of the psychology department. It is disingenuous for Wilkenfield to contend that he was unaware of any requirements other than those contained in a single paragraph in the catalogue. The Court would direct Wilkenfield's attention to the following passage from page 25 of the graduate catalogue: "All doctoral work is subject to review by the Dean. The real basis on which the degree is awarded is the candidate's demonstration of his mastery of a selected field and of his ability to do independent scholarship in it."

Wilkenfield contends also that the decision was arbitrary and in bad faith because it was made in violation of university regulations and because of ill will on the part of Manosevitz. The Court disagrees. First, there is no evidence that Manosevitz acted in bad faith or out of ill will towards Wilkenfield. Even Wilkenfield could testify only that Manosevitz had been "antagonistic." All other evidence demonstrates that Manosevitz and the other members of the psychology department acted with patience, understanding, and complete fairness.

■ Second, even if the department did not comply with university regulations when they dropped Wilkenfield, their noncompliance would not in itself violate his constitutional right to due process. *Hill v. Trustees of Indiana University*, 537 F.2d 248, 252 (7th Cir.1976). This Court need not rule on Wilkenfield's theory of "per se" arbitrariness, however, because it is apparent from the evidence that the members of the psychology department were at all times acting within the authority delegated to them by the dean of the graduate school through the committee on graduate studies.

■ Likewise, the Court need not decide whether Wilkenfield has a constitutionally

protected interest in pursuing a doctoral degree. It is apparent from the record that Wilkenfield received much more due process than is required by the fourteenth amendment. The CTC informed him of the faculty's dissatisfaction with his progress well in advance of its decision to drop him. The Executive Committee extended the deadline, but terminated Wilkenfield when it determined that he did not meet the deadline and was unlikely to satisfy the requirements within a reasonable time. The decision was reviewed by an independent panel of faculty members after an interview with Wilkenfield. The decision was next reviewed by the dean of the graduate school and a second independent faculty panel that met with Wilkenfield. The president of the university affirmed the decisions after reviewing the record. This Court could not require a more extensive or fair process by which the university could make decisions regarding the academic qualifications of its students. Under such circumstances, the Court concludes that Wilkenfield's constitutional rights were not violated.

Accordingly, the plaintiff's motion for a preliminary injunction is DENIED, and JUDGMENT will be entered in the defendants' favor, with each party to bear its own costs.