Diane L. MAURIELLO,
Appellant in 84–5720,

. v.

The UNIVERSITY OF MEDICINE AND
DENTISTRY OF NEW JERSEY, the
Graduate School of Biomedical Sci-
ences, Giampiero di Mayorca, M.D., in-
dividually and as Chairperson of the
Department of Microbiology, Rodney
Rothstein, Ph.D., individually and as
Chairperson of the Graduate Commit-
tee of the Department of Microbiology,
Vilma K. Jansons, Ph.D., jointly and
severally, Appellants in 84–5666.

Nos. 84–5666, 84–5720.

United States Court of Appeals,
Third Circuit.

Argued Nov. 6, 1985.

Decided Jan. 14, 1986.

Robert S. Ellenport (Argued), Marie P. Simonelli, Perry Feinberg, Ellenport & Holsinger, P.A., Roseland, N.J., for appellant Diane L. Mauriello.

Barbara A. Harned (Argued), Andrea M. Silkowitz, Deputy Attys. Gen., Irwin I. Kimmelman, Atty. Gen., N.J., Newark, N.J., for appellants—The University of Medicine and Dentistry of New Jersey, Giampiero di Mayorca, and Rodney Rothstein.

Before SEITZ, WEIS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

This case presents the issue of due process requirements in the dismissal of a student from a state university's graduate program. After reviewing the record, we conclude that a series of informal academic evaluations by the faculty met constitutional standards and prevents judicial reexamination of the plaintiff's fitness to continue at the University. Accordingly, we will set aside a jury's damage award and a district court decree directing reinstatement pending reevaluation.

The plaintiff's complaint sought damages and injunctive relief under 42 U.S.C. § 1983 against the University of Medicine and Dentistry of New Jersey, as well as Professors Jansons, di Mayorca, and Rothstein. A jury allowed damages against the University, and by way of equitable relief the court directed a reevaluation of the plaintiff's academic work. Defendants have appealed the denial of their post-trial motions. Plaintiff has cross-appealed.

The University is a public institution of higher learning, and it is uncontested that the requisite state action exists.

Plaintiff was admitted to the doctoral program in microbiology at the University in 1975. She withdrew after a few weeks and was readmitted in September 1977. She completed her course requirements in 1979, and selected as her faculty advisor Dr. Vilma Jansons, who had access to a laboratory and was conducting research in an area of interest to plaintiff.

The faculty advisor provides a student with the laboratory facilities, funding, and guidance needed to research a thesis. That professor is also responsible for evaluating a student's progress. After obtaining approval from the advisor, a student must submit a thesis and a dissertation abstract to an evaluation committee for review. If the work is acceptable, the committee will recommend that a doctorate be awarded.

In 1980, plaintiff submitted a thesis proposal to Dr. Jansons and passed a qualifying examination. Plaintiff was required to submit a revision of her thesis proposal but did not do so for some twenty months. She finally obtained approval on July 9, 1982.

Part of the plaintiff's research efforts were incorporated into scientific papers that Dr. Jansons submitted for publication. These articles were rejected because of erroneous data, and this disapproval led Dr. Jansons to reevaluate the plaintiff's work. Deciding that she could no longer sponsor the plaintiff's research, Dr. Jansons, on September 3, 1982, wrote to Dr. di Mayorca, Chairman of the Department of Microbiology, stating that she was withdrawing as the plaintiff's faculty advisor as of December 31, 1982. The letter noted that there had been "less than satisfactory progress in [plaintiff's] research and several demonstrated instances of severe lack of understanding of the most pertinent data in the literature.... Diane's commitment to research is not serious."

Plaintiff then met with Dr. di Mayorca and was told to "go back to the lab to correct the inaccuracies" in the research. On returning to the laboratory and discuss-

ing the matter further with Dr. Jansons, plaintiff resumed her research on a probationary basis. However, in November 1982, plaintiff accepted full-time employment with an outside corporation, and limited her work in Dr. Jansons' laboratory to a part-time basis.

Soon thereafter, Dr. Jansons sent a note to plaintiff expressing dissatisfaction with her work. Setting an absolute deadline for certain assignments, Dr. Jansons wrote, "Where is the change that you said took place this autumn in you and according to you made you worthy of defending a Ph.D. thesis? It was, perhaps, different for some weeks after you were put on probation; now it's business as usual—total irresponsibility."

Because of the plaintiff's lack of progress and dedication, on December 15, Dr. Jansons submitted a report to Dr. Rothstein, Chairman of the Graduate Committee, stating that she would not sponsor the plaintiff's research after January 1, 1983. The memo continued, "[Plaintiff had] assured me that her performance would improve and, if not, she would withdraw from the graduate school. There has not been any improvement."

Plaintiff had met with Dr. Rothstein on December 14th and had explained her difficulties with Dr. Jansons. Plaintiff agreed to meet on January 6, 1983 with the graduate committee, an entity that serves as an advisory body to the department chairman on matters pertinent to Ph.D. candidates. In the meantime, plaintiff took no steps to secure another faculty advisor.

There was a dispute at trial over the instructions plaintiff was given as to the material she was to present at the January meeting. In any event, plaintiff arrived with only some of the data she used in the faulty experiments performed for Dr. Jansons. The committee, however, wanted to see the thesis material as well as some other extraneous research notes and scheduled another meeting for February 2nd. Before that occurred, the committee met with Dr. Jansons to discuss her appraisal of the plaintiff's work. At the conclusion of that conference, some consideration was given to dismissing plaintiff from the doctoral program.

At the meeting on February 2nd, plaintiff again appeared without the thesis data. She testified she did not bring that material because Dr. di Mayorca had told her to bring the extraneous research notes instead. Because plaintiff again did not have the desired material, the committee scheduled a third meeting. Two days later, plaintiff told Dr. di Mayorca she would be unable to present the extraneous research because Dr. Jansons possessed much of it. Dr. di Mayorca was surprised that plaintiff did not have the documents because graduate students normally possess several copies of data from experiments they conduct.

Dr. di Mayorca advised the committee members that plaintiff was unable to produce the requested material, and therefore a majority adopted the previously tentative decision to dismiss. Accordingly, on February 14, 1983, Dr. Rothstein notified plaintiff that she was no longer a candidate for a Ph.D. degree.[1]

At trial the district court ruled as a matter of law that the plaintiff's termination was an academic dismissal, not a disciplinary one. All claims against Dr. Jansons were dismissed, as were the counts for punitive and compensatory damages against Professors di Mayorca and Rothstein. The compensatory damage claim against the University was submitted to the jury. All defendants, except Dr. Jansons, remained in the case for injunctive purposes.

In response to special interrogatories, the jury found that the University did not provide the requisite procedural due pro-

1. The notice also stated that since plaintiff had fulfilled the requirements of an M.S. degree in microbiology, the committee recommended that she be awarded that degree. Several weeks later, however, plaintiff was informed that she was ineligible for the Master's degree because she had not submitted a thesis for approval. It appears that she is still eligible for that degree if she prepares an acceptable thesis.

cess, that the plaintiff's academic performance was not reviewed before dismissal, and that the defendant's action was arbitrary and capricious. The jury awarded $50,015 in compensatory damages.

Finding the verdict excessive, the district court directed a remittitur of $40,000, which the plaintiff accepted. As an equitable remedy, the district court ordered the parties to select an ad hoc committee of three persons, one member selected by plaintiff, one by the defendants, and the third by the two selected members. This committee was to review the plaintiff's thesis research material. Plaintiff was reinstated into the doctoral program and was permitted to make a presentation to the ad hoc committee.[2] The court also denied the defendants' post-trial motions for a new trial and judgment n.o.v.

On appeal, defendants contend that plaintiff did not have a property interest in continuing in the program, but even assuming the existence of such an interest, due process requirements were satisfied, and the dismissal was not arbitrary or capricious. Other issues raised in both the direct and cross-appeals need not be discussed in view of our disposition.

### I.

Preliminarily, we address a jurisdictional matter. The district court's order denying the defendants' motions for judgment n.o.v. and new trial was docketed on August 28, 1984. The order stated that a new trial would be granted "unless plaintiff ... consents to remit the sum of $40,000 ... within 14 days." Plaintiff did so, and the acceptance was docketed on August 31, 1984. The notice of appeal was filed on September 28, 1984.

■ The question is whether the judgment became final when the remittitur order was entered or when the plaintiff's acceptance was filed. We conclude that the latter date is determinative for computing the time for appeal.

In *United States v. Schaefer Brewing Co.*, 356 U.S. 227, 78 S.Ct. 674, 2 L.Ed.2d 721 (1958), the Court said that "[i]t is necessary to determine whether the language of the opinion embodies the essential elements of a judgment for money and clearly evidences the judge's intention that it shall be his final act in the case. If it does so, it constitutes his final judgment." *Id.* at 232, 78 S.Ct. at 678. To be final, a "judgment for money must, at least determine, or specify the means for determining the amount." *Id.* at 233, 78 S.Ct. at 678.

An issue similar to the one here was decided in *Howell v. Marmpegaso Compania Naviera, S.A.*, 566 F.2d 992, 993 (5th Cir.1978). The court held that until the plaintiff consented to the "remittitur, the judgment remained open, unfinished and inconclusive.... [A]cceptance of the remittitur rendered the judgment final and appealable, and actuated the 30-day time limit within which a notice of appeal must be filed." *See also Gila River Ranch, Inc. v. United States*, 368 F.2d 354, 357 (9th Cir.1966); 15 C. Wright & A. Miller & Cooper, *Federal Practice and Procedure* § 3915, at 603–04 (1976).

In the case at hand, until plaintiff accepted the remittitur, the University did not know the extent of its liability. The amount of the judgment was not fixed until plaintiff filed her consent, and at that point the time for appeal began to run. The notice of appeal was filed within 30 days of the plaintiff's acceptance, and therefore was timely.

### II.

We turn now to the merits of the case. The Supreme Court had occasion to discuss the due process rights of students in state operated universities in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) and *Regents of the University of*

---

**2.** After reviewing the dissertation material, the ad hoc committee met with plaintiff on October 9, 1985 and reported its unanimous decision that the plaintiff's research was "not of good scientific quality and Ph.D. caliber."

*Michigan v. Ewing*, —— U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). *Horowitz* focused on procedural due process, while in *Ewing* the student's claim was based on substantive due process. In both cases the Court specifically assumed without deciding the existence of liberty or property interest but found no basis for holding the universities liable.

▇ The Court has made a clear distinction between disciplinary and academic dismissals. In the latter circumstance, courts are ill-equipped to review the largely subjective academic appraisals of the faculty. "[T]he determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955. A formal hearing is not necessary; rather an "informal-give-and-take" between the student and the administrative body dismissing her is adequate. "[A] hearing may be useless or harmful in finding out the truth as to scholarship." *Id.* Thus, in the procedural due process context, informal review and evaluation sessions between student and faculty meet constitutional requirements.

In the *Ewing* substantive due process context, the Court assumed "the existence of a constitutionally protectible right in [the student's] continued enrollment" but found, after reviewing the record, that the right had not been violated. The student's dismissal "rested on an academic judgment that is not beyond the pale of reasoned academic decisionmaking when viewed against the background of his entire career at the University."

The Court observed that when judges are asked to "review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." The Court fur-

ther noted that judges have a special responsibility to safeguard the academic freedom of state and local educational institutions. —— U.S. at ——, 106 S.Ct. at 513. *See also Stevens v. Hunt*, 646 F.2d 1168 (6th Cir.1981); *Ikpeazu v. The University of Nebraska*, 775 F.2d 250 (8th Cir.1985); *Hines v. Rinker*, 667 F.2d 699 (8th Cir. 1981); *Miller v. Hamline University of Law*, 601 F.2d 970 (8th Cir.1979).

In his concurrence in *Ewing*, Justice Powell wrote that the student's "claim to a property right is dubious at best," and noted that in contrast to the procedural due process cases where the protected interests originate under state law, substantive due process rights are created by the federal constitution. He found that the student's claim bore "little resemblance to the fundamental interests that previously had been viewed as implicitly protected by the Constitution." —— U.S. at ——, 106 S.Ct. at 516.

▇ We have no difficulty in deciding that the plaintiff's dismissal here was based on academic not disciplinary grounds. As the district judge stated, "it was not a case of her being compelled by rule, order, or law of the school to do something and not having done it getting discharged. ... This is not a case of somebody being disruptive in her misconduct, it is not a *Goss v. Lopez*, [419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)] situation." The focus of the University's inquiry was on the quality of the plaintiff's research and her dedication to academic pursuits, not misconduct.

In denying the defendants' motion for a directed verdict, the district judge said he believed that *Horowitz* required some kind of a hearing for plaintiff by the University. His views of the applicable law are reflected in his charge to the jury: "plaintiff had a right to notice of what the proceedings before the graduate committee would involve, and that she be aware, or be made aware, of whatever action was being considered with respect to her, and that she be given an opportunity to present her side of

the case before being dismissed from the Ph.D. program."

On the issue of substantive due process, the jurors were told to determine whether the defendants' actions were arbitrary or capricious—whether there was a rational basis for the dismissal based on the quality of the plaintiff's work, or whether the defendants' decision was motivated by bad faith or ill-will, without any relationship to her academic performance.

We conclude that the submission of these matters to the jury was error because the plaintiff's proof was insufficient to survive the defendants' motion for a directed verdict. In reviewing the denial of a judgment n.o.v., we must consider the facts in the light most favorable to plaintiff. *Kademenos v. Equitable Life Assurance Soc.*, 513 F.2d 1073 (3d Cir.1975); *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96 (3d Cir. 1977); *Hahn v. Atlantic Richfield Co.*, 625 F.2d 1095 (3d Cir.1980). However, if after review of the facts, it appears that under the applicable law the plaintiff has failed to present sufficient evidence to establish a claim, then judgment must be entered for the defendant. *See Molthan v. Temple University*, 778 F.2d 955 (3d Cir.1985); *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340 (3d Cir.1981); *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.1969).

In essence, plaintiff asserts that the graduate committee arbitrarily dismissed her because she did not produce the requested records. The testimony at trial shows that this was only one of the factors considered. It is not disputed that plaintiff made serious errors in research and that as early as September 1982 Dr. Jansons communicated her dissatisfaction to Dr. di Mayorca. After being granted a probationary period, plaintiff accepted full-time outside employment while failing to show improvement in her academic work. Characterizing the plaintiff's attitude as irresponsible, Dr. Jansons wrote once more to the graduate committee that she would no longer sponsor the plaintiff's research or serve as faculty advisor.

Plaintiff then chose to discuss the matter with the graduate committee. As the trial judge phrased it, the "ball was in her court" but she made no effort to secure another faculty advisor, explaining that she expected help from the committee.

■ In three scheduled meetings with the graduate committee, plaintiff failed to produce materials that the average doctoral candidate would have expected to be of prime interest to the faculty. Plaintiff explained that on the first two occasions she was misled by the instructions given her. The third meeting never occurred because allegedly she could not obtain some of the extraneous research data. A doctoral candidate's failure to keep and maintain research notes is an additional fact that the faculty may consider in evaluating a student's academic performance.

Plaintiff cannot deny that she was aware of the criticism of her research abilities or that she was twice informed her faculty advisor was going to withdraw. Unquestionably, plaintiff was on notice no later than September 1982 that her continuance as a Ph.D. candidate was in jeopardy.

■ In an educational setting, a student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance. This record leaves no doubt that the academic record of plaintiff was a determinative, if not the sole, reason for her dismissal.

The district court's concern that the University did not provide notice and opportunity for plaintiff to present an explanation of her position was misguided in two respects. The court focused on the last of the three scheduled meetings with the committee but failed to consider events beginning in September 1982. In addition, the court unduly equated procedural due process in this case to the more traditional trial type proceeding. However, as stated in *Horowitz* and *Ewing*, when a student is discharged for academic reasons, an informal faculty evaluation with the student is all that is required.

 Here, plaintiff was informed of her academic deficiencies, was given an opportunity to rectify them during a probationary period before being dismissed, and was allowed to present her grievance to the graduate committee. That she was eventually dismissed does not negate the existence of those favorable forms of due process.

It follows that there were no factual issues to submit to the jury because, as a matter of law, plaintiff had received all the procedural due process to which she was entitled.

 A similar result obtains with respect to the substantive due process claim. We share Justice Powell's doubt about the existence of such a substantive due process right in the circumstances here, but following the lead of the Supreme Court, we will assume *arguendo* that a constitutional right is implicated. Even so, we are required to show "great respect for the faculty's professional judgment." *Ewing*, —— U.S. at ——, 106 S.Ct. at 513. The one faculty member who had the most extensive knowledge of the plaintiff's capabilities and attainments, or lack of them, was Dr. Jansons. Her evaluations are clear and forthright, and there is no basis for us or a jury to question her judgment.

In view of the professional evaluations contained in this record, we cannot say that the dismissal of plaintiff from the doctoral program was "beyond the pale of reasoned academic decisionmaking." *Id.* Likewise, we cannot say that the University impermissibly considered the plaintiff's choice to take outside full-time employment during her probationary period. Moreover, her failure to keep proper records demonstrated "a lack of judgment and inability to set priorities." *Ewing*, —— U.S. —— n. 13, 106 S.Ct. at 514 n. 13.

Although there may have been personality conflicts between plaintiff and some of the faculty members, the evidence does not permit a finding that the plaintiff's dismissal was for reasons other than the quality of her academic performance.

Accordingly, the judgment of the district court will be vacated and judgment will be entered for defendants.