Dr. David EILAND, et al., Appellants,

v.

Philip L. WOLF, Appellee.

No. 01–87–00266–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 12, 1989.

Rehearing Denied Feb. 9, 1989.

Kevin T. O'Hanlon, Asst. Atty. Gen., Austin, for appellants.

Mark Cohen, Austin, for appellee.

Before EVANS, C.J., and DUNN and SAM BASS, JJ.

## OPINION

DUNN, Justice.

This is an appeal from a final judgment granting declaratory relief and a permanent injunction based on appellee's wrong-

ful dismissal from medical school after failing his final course.

The appellee, Philip L. Wolf, brought this action against the following officials of the University of Texas Medical Branch at Galveston, individually and in their respective official capacities: Dr. David Eiland, Dean of Student Affairs; Dr. George Bryan, Dean of the University of Texas Medical Branch; Dr. William A. Levin, President of the Medical Branch; and Dr. Charles Mullins, Executive Vice–Chancellor for Health Affairs of the University of Texas System.

The appellee alleged that he was a medical student at the University of Texas Medical Branch at Galveston, and that he had successfully completed all the requirements for graduation with the exception of one four-week elective course that he had failed and had not been allowed to retake. He alleged that because of the appellants' arbitrary and capricious actions, violation of his equal protection and due process rights, and breach of contractual rights, he was prevented from completing his academic work and that the appellants threatened to deny him a Degree of Doctor of Medicine, even if he successfully completed the one remaining elective course. The appellee contended that the appellants' conduct was a result of institutional bias against him, stemming from his obtaining a court order to reinstate him in his third year after he was not allowed to attend classes pending an appeal of a prior non-academic dismissal. That dismissal, which was based on the appellee's failure to include some significant information on his loan application, was eventually overturned by the school.

The appellee sought a declaratory judgment that he was entitled to the degree of Doctor of Medicine upon presentation of evidence of good moral character, compliance with necessary legal and financial requirements, and a passing grade in the academic curriculum. He also sought a temporary and permanent injunction enjoining the appellants from directly or indirectly denying his status as a student in good standing and ordering them to award

him the degree of Doctor of Medicine upon his meeting the criteria stated above.

The trial court granted an interlocutory order that allowed the appellee to retake his elective, the last course required for his graduation. During trial, the appellee received a passing grade in the course. After a non-jury trial, the court entered a final judgment for the appellee, declaring that he was entitled to be awarded the degree of Doctor of Medicine from the University of Texas Medical Branch at Galveston. In its judgment, the court prohibited the appellants from taking any action that would indicate that there is any reason for not awarding the appellee the medical degree. The court also enjoined the appellants from taking any action that might directly or indirectly impede or interfere with the appellee's acceptance of the degree, and required that they take all steps necessary to ensure that he was awarded the degree. The court directed that they inform the Board of Regents that the appellee had satisfactorily completed the prescribed curriculum, that the requirement of faculty recommendation had been dispensed with in the appellee's case, and that the appellee was entitled to be awarded the degree. The judgment ordered that the appellee be awarded the degree without qualification, and that the appellants were to certify the appellee's receipt of the degree to anyone entitled to such certification.

In separate findings of fact and conclusions of law, the court determined, in essence: (1) that the appellants were responsible for and controlled and supervised the granting or denial of a degree in medicine; (2) that when the appellee was admitted to school in 1981, it was agreed that he would be entitled to the degree of Doctor of Medicine upon satisfactory completion of the prescribed curriculum, which would be ascertained according to specific rules and procedures; (3) that in reliance upon that understanding, the appellee enrolled in school, paid charges, and devoted five years of time and effort toward completion of the required curriculum; (4) that it was also understood that if the appellee satisfactorily completed the required curric-

ulum, he would be automatically recommended by the faculty, and that then, upon proof of his age and moral character, he would be automatically certified by the Board of Regents; (5) that the appellee had satisfactorily completed the prescribed curriculum and was therefore entitled to a faculty recommendation that he be awarded the degree of Doctor of Medicine; (6) that unless enjoined, the appellants would prevent the appellee from retaking any courses needed to complete the prescribed curriculum, and unless compelled to do so, would not automatically recommend that the appellee be awarded the degree of Doctor of Medicine.

The court concluded that the appellee's failing grades were void and that his dismissal was arbitrary and capricious, an abuse of authority, in violation of the appellee's due process and equal protection rights, and in breach of express and implied agreements.

The appellants contend that the evidence is legally and factually insufficient to support the trial court's findings that the actions of the appellants were unconstitutionally arbitrary and capricious and in violation of the appellee's due process and equal protection rights. Appellants also assert that the appellee's contract claim was barred by the doctrine of sovereign immunity and that they breached no contractual obligations.

In 1981, when the appellee first enrolled in school, he received the school catalog, which he testified that he later used as a reference as he proceeded through school. The catalog provides:

Degree of Doctor of Medicine

The degree of Doctor of Medicine is awarded upon satisfactory completion of the prescribed curriculum in the School of Medicine, recommendation of the Faculty of Medicine, and certification by the Board of Regents. Candidates must (1) be at least 18 years of age at the time the degree is awarded; (2) present evidence of good moral character; (3) offer satisfactory evidence of having properly fulfilled all academic curricula including acceptable performance on Parts I and II of National Board Examinations, and (4) comply with all necessary legal and financial requirements.

Prior to graduation and receipt of diploma, all students must have arranged to take care of all just indebtedness in accordance with the rules outlined under Student Debts.

The catalog further provides that, at regular intervals during a student's course of study, three separate faculty evaluation committees review a student's performance during a designated grading sequence for the purpose of determining eligibility for promotion or graduation. Under the catalog provisions, Committee A reviews a student for promotion to phase two in Basic Science; Committee B reviews a student for promotion to Clinical Medicine; and Committee C reviews a student's performance in the Clinical Medicine courses and recommends students for final graduation.

Appellant's academic performance at the time of the questioned dismissal was evaluated by Committee "C", which reviewed a student's academic performance during its grading sequence for promotion and graduation. If a student did not agree with the recommendation of his evaluating committee, he could appeal the decision and present any witnesses or supporting material to the committee. If after rehearing, the committee did not change its recommendation, the student could appeal the committee's action to the Dean of Medicine.

The appellee received failing grades in four courses in phases two and three. In the first two courses he failed, he was later given passing grades after successfully completing a final patient interview in Patient Evaluation, and retaking and passing his final examination in Dermatology. He later also failed Internal Medicine and Pediatrics, in the Clinical Medicine phase. After the appellee's failing grades in Dermatology and Internal Medicine, Committee C met but decided not to make any recommendation of what action to take until appellee completed his Pediatrics course. When appellee also failed Pediatrics, Committee C reviewed his academic perform-

ance and recommended that he be dismissed from medical school.

The appellee requested an appearance before Committee C, asking for a reconsideration of the recommendation and explaining a misunderstanding he felt existed during his Pediatrics course service. Following the rehearing, Committee C upheld its recommendation that he be dismissed.

The appellee appealed Committee C's recommendation to the Dean of Medicine, Dean Bryan ("the Dean"). At a hearing in May 1985, the Dean heard the appellee's explanation of his failing grades and his failing his National Board Examination in Internal Medicine. The Dean allowed the appellee's attorney to question two pediatrics residents whose failing evaluations were the basis for the appellee's "F" in Pediatrics. One instructor stated that the appellee had twice written improper orders for laboratory data on patients' charts. She stated that on one occasion, the appellee ordered an additional test without authorization, by writing the order above an instructor's signature. The second time, after he had been admonished about the first incident, the appellee wrote an order and had it signed by someone other than the "house officer," who was supposed to authorize such orders, even though the house physician was at the hospital. She also stated that the appellee did not write up patient histories or do physicals as expected during his month of service. Another pediatrics instructor explained that the appellee had mishandled a parent, causing her to become hysterical when he told her that her baby probably had a disease that was fatal 25 percent of the time. However, the parent testified on behalf of the appellee, commending him for explaining the seriousness of her child's condition. The instructor also stated that the appellee had behaved inappropriately while under her supervision, for example, reading a magazine when she gave her initial instructions to him and his fellow "team" members.

After the hearing, the Dean reversed the Committee's recommendation, and agreed to put the appellee on probation, because according to his testimony at trial, "there was some question as to whether the appellee had been treated absolutely fairly." The appellee was to be placed on probation pending his successful retaking of the two failed courses, Internal Medicine and Pediatrics, with a grade of at least a "C". The Dean's letter dated June 18, 1985, stated:

I have reviewed carefully all testimony before me on Saturday, May 11, 1985, as well as the supporting documents provided at that meeting. I also have reviewed your complete record of academic performance in Medical School. Based on the evidence presented and your overall academic performance, I hereby reverse the action of Committee "C" which dropped you from the rolls. Instead you may continue in school on academic probation. The probation will end on successful completion of the core pediatric and internal medicine segments. The highest overall grade that you may earn will be a minimum "C", and failure to accomplish a "C" will result in immediate academic dismissal from the medical school.

With regard to the prior disciplinary matter for which you were dropped from the rolls on September 12, 1983, I hereby assess a penalty of six months delay in your date of graduation, said six months to include the 13 weeks of school missed between September 12, 1983, and January 9, 1984.

After completing his Internal Medicine course in the fall of 1985, but before retaking his Pediatrics course, the appellee was given special permission to take his senior elective, usually not taken until all other course work is completed. He signed up for a four-week Community Health clerkship for which he proposed doing a study of the health care system of Panama. In Spring 1986, after the appellee successfully completed the Pediatrics course, he turned in his paper in the Community Health elective. The elective was offered as a four-week or eight-week course. However, the appellee did not turn in a written paper until April 1986, after his faculty advisor asked him in March why he had not completed his elective.

After the appellee successfully completed his Internal Medicine and Pediatrics courses, he received a second letter from the Dean, which is dated March 28, 1986. In this letter, the Dean stated that a review of the appellee's record indicated he would be eligible for graduation upon satisfaction of the Advanced Coronary Life Support requirements, which the appellee did satisfy. The Dean's letter, which made no mention of the appellee's senior elective in Community Health, then stated that after the appellee repeated the Advanced Coronary Life Support examination, he would be presented to the faculty for certification and would be eligible for graduation.

After receiving this letter, the appellee was notified that his senior elective advisor had given him an "F" in his Community Health clerkship, because the appellee had "never developed a plan for the elective, so the elective was never completed." The faculty advisor testified that he and the appellee discussed at great length, his inadequate paper and failure to develop a plan in the elective, but the appellee did not want to do any more work on the paper, and the instructor considered his work in the course incomplete. The appellee complained that he had never been advised that a plan was required, that the requirement was not included in the course outline, and that no other elective required such a plan. The advisor stated that he had so advised the appellee, and stated that in the case of the one other student that he had previously supervised, the student had prepared such a plan, although the plan was not in writing.

When Committee C received notice of the appellee's failing grade in the Community Health elective, it once again reviewed his academic performance and recommended his dismissal. The appellee again requested and was granted a hearing before Committee C to discuss whether his elective grade should be overturned. In his pleadings, the appellee further asserted, and the trial court agreed, that the catalog did not require Committee C's approval to retake an elective; it only authorized the Committee to review courses in the Clinical Medicine phase and to make recommendations for a student's graduation.

The Committee questioned the appellee about his work on his elective paper and asked for documentation proving that he had indeed done the study. The appellee was unprepared, at that time, to offer supporting evidence on that question. Upon Committee C's refusal to change its recommendation for dismissal, the appellee again appealed the Committee's decision to the Dean, who had already endorsed the Committee's recommendation.

At the hearing before the Dean, the appellee furnished letters he had obtained from doctors he had interviewed in Panama, showing that he had in fact done the study for the Community Health elective. But the Dean then informed the appellee that his dismissal was not based solely on his failure of the senior elective course, and, instead, was based on his entire academic performance. One of the members of Committee C acknowledged that Committee C had considered the appellee's entire academic record in reaching its conclusion, and admitted that the Committee had never been given any explanation of the circumstances surrounding the appellee's failing grades, which pursuant to school policy, remained on the appellee's academic record.

Again, the appellee was not prepared to address the breadth of the issues raised at the hearing, and he asked for additional time to do so. The Dean suggested that he address his academic failings in a written memorandum, which the appellee did. After considering the appellee's memorandum, the Dean reaffirmed his recommendation to dismiss the appellee from the school. The appellee then instituted this action.

## DUE PROCESS

■ We first address the contention that the trial court erred in finding a violation of the appellee's due process rights. However, before we reach the substance of the trial court's findings and conclusions, we must examine whether the trial court's review of the evidence and its resulting find-

ings were based on its application of the proper standard of review.

Historically, the courts have refused to review a school's decision to dismiss a student except under limited circumstances, such as allegations and proof that the school officials acted arbitrarily and capriciously, or otherwise abused the authority vested in them. *Foley v. Benedict,* 122 Tex. 193, 55 S.W.2d 805 (Tex.Comm'n App. 1932, opinion adopted); *see Hines v. Rinker,* 667 F.2d 699 (8th Cir.1981); *Gaspar v. Bruton,* 513 F.2d 843 (10th Cir.1975). If the dismissal was based on academic grounds, the school's decision was not to be disturbed unless it was motivated by bad faith or ill-will unrelated to academic performance, or was based on arbitrary and capricious factors not reasonably related to academic criteria. *Hines,* 667 F.2d at 703; *Wilkenfield v. Powell,* 577 F.Supp. 579, 583 (W.D.Tex.1983). Recent decisions of the United States Supreme Court have not only affirmed, but indeed have further restricted, this already narrow standard of evaluating suits based on academic dismissals.

In *Board of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), a suit brought by a medical student dismissed by a faculty committee and dean, the Supreme Court noted, "Courts are particularly ill-equipped to evaluate academic performance," and the Court strongly warned against judicial intrusion into academic decision making. *Horowitz,* 435 U.S. at 92, 98 S.Ct. at 956. Noting that academic evaluations of a student are not readily adapted to judicial and administrative review, the Court recognized that the determination of whether to dismiss a student for academic reasons "requires an expert evaluation of cumulative information that is by nature somewhat subjective." *Id.* at 90, 98 S.Ct. at 955. This function is by tradition and reason left to school officials, to whose judgment a reviewing court is to accord great deference. *Id.*

The Court distinguished the constitutional requirements for a disciplinary dismissal from one based on academic factors and expressly declined to "further enlarge the judicial presence in the academic community...." *Horowitz,* 435 U.S. at 90, 98 S.Ct. at 955. Although the medical student in *Horowitz* alleged that her dismissal was for disciplinary reasons, rather than academic ones, the Supreme Court noted that the faculty could legitimately consider such aspects as poor personal hygiene and timeliness in keeping clinical schedules as "important factors" in its determination of whether a student will make a good medical doctor. Even though questions of timeliness and personal hygiene may seem more analogous to traditional factfinding than other "academic" evaluations, the Court recognized that a school typically considers and weighs a variety of factors in making an academic evaluation. *Id.,* 435 U.S. at 91 n. 6, 98 S.Ct. at 955 n. 6. In medical school, "competence in clinical courses is as much of a prerequisite to graduation as satisfactory grades in other courses.... Evaluation of [the student's] performance in [clinical skills] is no less an 'academic' judgment because it involves observation of ... skills and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question." *Horowitz,* 435 U.S. at 95, 98 S.Ct. at 957 (Powell, J., concurring).

Regarding procedural due process requirements, the Court has distinguished between decisions to dismiss a student for disciplinary reasons, and similar actions taken for academic reasons. A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him, and the opportunity to present his side of the story. *Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975). However, a formal hearing is not required, but only an "informal give-and-take" between the student and the administrative body dismissing him that would allow the student to explain his conduct and to put it in context. *Id.* at 584, 95 S.Ct. at 741.

An academic dismissal, in contrast, calls for far less stringent procedural requirements. *Horowitz,* 435 U.S. at 86, 98 S.Ct. at 953. Because a hearing may be useless in determining the truth concerning schol-

arship, as opposed to misconduct, the Supreme Court in *Horowitz*, held that the fourteenth amendment due process clause did not require *any* hearing before a medical school or university dismissed a student for academic reasons. *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955.

In the instant case, appellee received notice of his academic evaluations and recommendations of dismissal, a rehearing of his evaluating committee's initial decision, and an appeal to the Dean of Medicine. The appellee was allowed to appear before Committee C to request that the recommendation of dismissal be reconsidered and to explain his record and circumstances. He then appealed to Dean Bryan, who gave him a hearing in May 1985, where he was allowed to explain his failing grades and to question two pediatric residents whose evaluations were the basis of his "F" in that course. He also gave an explanation for failing his Internal Medicine course and his National Board Exam in Internal Medicine. The Dean then placed him on probation, and he repeated and successfully completed Internal Medicine and Pediatrics. However, he received another failing grade, this time in a Community Health clerkship, and Committee C once again reviewed his academic record and, after the appellee was granted another hearing, recommended dismissal. Appellee again appealed to the Dean, who also gave him another hearing. When he was unable to adequately address his entire academic record, upon which the recommendation was based, the Dean advised him to explain his academic failings in a written memorandum. After review of this memorandum, the Dean agreed with the recommendation to dismiss the appellee.

We find that under the Supreme Court's standards discussed above, the appellee was afforded adequate procedural due process throughout his conflict with the medical school administration. As previously noted, a dismissal for academic reasons requires no hearing at all, and one based on disciplinary misconduct requires only an informal "give-and-take," not a formal hearing. *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955; *Goss v. Lopez*, 419 U.S. at 584, 95 S.Ct.

at 741. There was no violation of the appellee's right to procedural due process under the fourteenth amendment.

■ We next examine whether the trial court erred, as a matter of law, in finding a violation of the appellee's substantive due process rights. The examination of this question is strictly limited by the applicable standard of review.

■ Ordinarily, unless a claim involves the violation of fundamental rights, the court will not interfere with the State's action if it finds a rational basis for the action. In fact, as long as a rational basis for the action exists, it need not be the real reason for the government action to satisfy substantive due process. *See Scott v. City of Sioux City*, 736 F.2d 1207, 1216–17 n. 11 (8th Cir.1984), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).

However, in reviewing academic decisions, the Supreme Court again refined its constitutional standard of review, this time to relate the traditional "rational basis" test specifically to an academic setting. In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the Supreme Court again considered a case involving facts similar to those in the instant case, and pronounced the proper standard of review.

In *Ewing*, a medical student alleged that his dismissal from the medical degree program violated his "implied contract right to continued enrollment free from arbitrary dismissal." *Id.*, 474 U.S. at 223, 106 S.Ct. at 512. The evidence adduced in the trial court demonstrated, similarly to the case at bar, an "unfortunate academic history," including marginally passing grades, a number of incompletes and make-up examinations, and repeated courses, culminating in his failure to pass a written examination of the National Board of Medical Examiners ("NBME") required of students before continuing in the medical school program. Ewing alleged, however, that other students with similar academic deficiencies were consistently allowed to retake the NBME exam and were not "arbitrarily" dismissed as he was.

In *Ewing,* the Supreme Court again emphasized its reluctance to intrude upon the prerogatives of educational institutions because of the courts' "responsibility to safeguard [the university's] academic freedom, a special concern of the First Amendment." *Id.; Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978); *see also Keyishian v. Board of Regents of the Univ. of the State of New York,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is ... a special concern of the First Amendment"). "The freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke,* 438 U.S. at 312, 98 S.Ct. at 2759. And the Court in *Ewing* explained that academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also on autonomous decision making by the university itself.

After reviewing its previous holdings on the scope of reviewing an academic decision, the Court in *Ewing* concluded that the "narrow avenue for judicial review" precluded the finding that the decision to dismiss Ewing was such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment. *Ewing,* 474 U.S. at 227, 106 S.Ct. at 514. The Court acknowledged that it was not in a position to substitute its judgment for that of the faculty committee, which "was uniquely positioned to observe [appellant's] judgment, self-discipline, and ability to handle stress, and was thus especially well-suited to make the necessary subjective judgment of [appellant's] prospects for success in the medical profession." *Id.* In reaching the final decision to dismiss, the faculty in *Ewing,* as in this case, "presumably considered not only the raw statistical data, but the nature and seriousness of the individual deficiencies" as well as their cumulative value in indicating the appellant's fitness for entering the medical profession. *Id.*

Since the *Ewing* decision, in evaluating a substantive due process claim based on allegedly arbitrary state action, a judge may not override the faculty's professional judgment in academic matters unless "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of the Univ. of Michigan v. Ewing,* 474 U.S. at 225, 106 S.Ct. at 513.

The school decisions since *Ewing* have followed its mandate. In these cases, no deference was accorded to the trial court or jury as factfinder; the reviewing court independently reviewed the record for minimum "professional judgment" evidence; once found, such evidence was considered sufficient to justify judgment against the student as a matter of law. *See, e.g., Levi v. University of Texas at San Antonio,* 840 F.2d 277, 280 (5th Cir.1988); *Clements v. County of Nassau,* 835 F.2d 1000, 1005 (2d Cir.1987); *Hankins v. Temple Univ. (Health Sciences Center),* 829 F.2d 437, 443 (3d Cir.1987); *Haberle v. University of Alabama,* 803 F.2d 1536 (11th Cir.1986); *Schuler v. University of Minnesota,* 788 F.2d 510 (8th Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Mauriello v. University of Medicine & Dentistry of New Jersey,* 781 F.2d 46 (3d Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986).

■ Thus, academic decisions must be reviewed by the courts under the "narrow" and "restrained" standard enunciated by the United States Supreme Court. In a suit challenging an academic dismissal, a judge must review the evidence or record for some evidence that professional judgment was exercised, e.g., evidence that there was some rational academic basis for the decision. If *any* such evidence exists (and even though there is some evidence of arbitrary action), the substantive due process inquiry ceases, because the court may not override the faculty's professional judgment unless it is such a substantial departure from accepted academic norms as to conclusively demonstrate that the person or committee responsible did not actually exercise professional judgment. *Re-*

*gents of the Univ. of Michigan v. Ewing,* 474 U.S. at 225, 106 S.Ct. at 513.

Although there was conflicting evidence regarding the actions of some of the faculty members in their academic relations with the appellee, the record contains *some* evidence showing an academic basis for the appellants' exercise of professional judgment in dismissing the appellee. There was evidence of the appellee's five failing grades, in both required courses and an elective, of repeated courses, of his consistent academic ranking near the bottom of his class, of his failure to pass a written exam of the National Board of Medical Examiners on Internal Medicine, and of several instances of unacceptable clinical performance. Given these facts, we cannot say that the decision to dismiss the appellee was such a substantial departure from accepted academic norms as to conclusively demonstrate that no professional judgment was exercised.

Under *Ewing,* the trial court was not authorized to override the school officials' professional judgment in these circumstances. In turn, because of the peculiar nature of judicial review of an academic dismissal, this Court may not apply the usual "no evidence/insufficient evidence" review of the trial court's findings. Because the record does not compel a finding that *no* professional judgment was exercised, we hold that the trial court erred in finding that appellee's dismissal was arbitrary and capricious in violation of his substantive due process rights. The appellants' points of error based on due process are sustained.

## EQUAL PROTECTION

The equal protection clause concerns itself with the State's classification of individuals for differing benefits or burdens. In the case of an academic promotion or dismissal, the only arguable "classification" at issue is between students who perform satisfactorily and those who do not. The decision of which students fall into these categories is "preeminently within the expertise and authority of the medical school faculty." *Mohammed v. Mathog,* 635 F.Supp. 748, 752 (E.D.Mich. 1986), and is primarily subject to due process rather than equal protection review.

The equal protection clause does not require all persons to be treated identically, *see San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 24, 93 S.Ct. 1278, 1291, 36 L.Ed.2d 16 (1973), but only that persons similarly situated be accorded similar treatment. In reviewing an equal protection challenge to an academic dismissal, we are again constrained in our analysis by the Supreme Court's narrow standard of review. *Ewing,* 474 U.S. at 228 n. 14, 106 S.Ct. at 515 n. 14; *Levi v. University of Texas at San Antonio,* 840 F.2d at 280–81 (acknowledging that the *Ewing* standard for reviewing academic decisions also extends to equal protection claims); *Clements v. County of Nassau,* 835 F.2d at 1006.

In *Ewing,* the Supreme Court rejected the student's equal protection claim against the university because of the great deference given to the decisions of university officials. The Court noted that there was evidence that other students with more incompletes, lower grades, and less outside research than Ewing were allowed to retake the board examination that Ewing was not permitted to retake. Nevertheless, the Court held that it was "not in a position to say that these students were 'similarly situated' with Ewing." The Court noted that the faculty promotion and review board (similarly to Committee C here) properly considered, in addition to the raw statistical data, other important, more subjective factors affecting its decision, such as "the nature and seriousness of the individual deficiencies and their concentration in particular disciplines ... the numerous incompletes and make-up examinations [the student] required to secure even marginally passing grades, and ... [the student's] judgment, self-discipline, and ability to handle stress...." *Ewing,* 474 U.S. at 228 n. 14, 106 S.Ct. at 515 n. 14. The Court reiterated that such factors made academic promotion decisions insusceptible to "rigorous judicial review." *Id.* Thus, if the academic decision is even debatable, the deci-

sion will not be reversed unless the record shows that the university went "beyond the pale of reasoned academic decision-making." *Ewing*, 474 U.S. at 227–28, 106 S.Ct. at 515; *Levi*, 840 F.2d at 281.

We cannot say that appellee's dismissal substantially deviated from accepted academic procedures as compared to the treatment of other students, because as in *Ewing*, we are not in a position to judge whether other students were similarly situated to the appellee. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. at 228 n. 14, 106 S.Ct. at 515 n. 14.

The appellants' equal protection points are sustained.

## CONTRACT CLAIM

Appellants also contend that the trial court erred in granting relief on the appellee's contract claim, because (1) as a matter of law, any breach of contract claim is barred by the doctrine of sovereign immunity, and (2) appellants did not breach any contractual obligations to the appellee.

The University of Texas Medical Branch, as part of the University of Texas System, Tex.Educ.Code Ann. secs. 65.02(a)(8), 74.-001 (Vernon 1972 & Supp.1988), is considered a state agency, thus enjoying sovereign immunity from suit. Where university officials are acting within their official capacity and exercising functions within their legal authority, they are entitled to the same immunity as the university, i.e., that of the State. *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 584 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

■ Thus, a suit to enjoin university officials acting within the scope of authority conferred upon them by the legislature is in effect a suit against the State, which cannot be maintained without the consent of the State. *Id.; see Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976). There is an exception to sovereign immunity for acts of officials that are not lawfully authorized. *Director of the Dep't of Agriculture & Environment v. Printing In-*

*dus. Ass'n*, 600 S.W.2d 264, 265–66 (Tex. 1980).

■ However, since the submission of this case, the Texas Supreme Court has ruled that the defense of sovereign immunity is waived if not affirmatively pleaded. *Davis v. City of San Antonio*, 752 S.W.2d 518 (Tex.1988); Tex.R.Civ.P. 94. The court in *Davis* held that governmental units must observe the same rules that bind all other litigants, including the rules governing pleadings and burden of proof. *Id.* at 519. The court rejected the contention that sovereign immunity bars liability "as a matter of law," or that governmental immunity is different from other defenses because the trial court lacks authority to decide claims outside any legislative waiver of sovereign immunity. Thus, because the record does not show that appellants affirmatively pleaded their defense of sovereign immunity, they may not, according to *Davis*, rely upon it now. Point of error one is overruled. We turn to the merits of the contract claim.

■ The Texas Legislature has delegated to the University of Texas Board of Regents the duty of implementing statutes pertaining to the University of Texas Medical Branch. *See* Tex.Educ.Code Ann. secs. 65.31, 65.02, 74.001 et seq. (Vernon 1972 & Supp.1988) (authorizing the board to prescribe degree programs and to promulgate university rules and regulations). Pursuant to this delegation of authority, the University of Texas Medical Branch catalog was compiled. All parties agree that the catalog is applicable to this case.

This Court once held that "a school's catalog constitutes a written contract between the educational institution and the patron, where entrance is under its terms." *University of Texas Health Science Center v. Babb*, 646 S.W.2d 502 (Tex.App.—Houston [1st Dist.] 1982, no writ). To support this holding, the court in *Babb* relied upon two early court of appeals' decisions that involved private schools. *Texas Military College v. Taylor*, 275 S.W. 1089 (Tex. Civ.App.—Beaumont 1925, no writ), and *Vidor v. Peacock*, 145 S.W. 672 (Tex.Civ. App.—San Antonio 1912, no writ). How-

ever, as the appellants point out, the relationship between a private school and its student has by definition primarily a contractual basis. Education at a public university, on the other hand, involves a benefit bestowed by the State upon its citizens. See *Foley v. Benedict*, 55 S.W.2d at 809. Thus, a contractual relationship need not necessarily be logically inferred to exist between a student and a State-supported institution. We have found no other Texas cases that address whether a public university's catalog constitutes a contract with the student.

We find that the circumstances in the *Babb* case are distinguishable from the present situation. In *Babb*, there was an express statement in the school catalog that allowed a student who began school under the terms of a certain catalog to continue through the program under the same catalog. Given this statement, the student was held to have a right to rely on the catalog's terms.

In the case at bar, the first page of the applicable catalog contains the express notice that "[t]he provisions of this catalogue are subject to change without notice and do not constitute an irrevocable contract between any student ... and The University of Texas Medical School at Galveston...." The catalog further provides, "Since matriculation in medical school is a privilege and not a right, the faculty retains the prerogative to request withdrawal of any student who does not attain adequate academic performance or who does not exhibit the personal qualifications prerequisite to the practice of medicine. These criteria shall apply at all times during the curriculum. Academic performance will not be the only factor in determining admission, promotion, graduation, or request for withdrawal." Further, regarding dismissals, the catalog states, "It must be clearly understood by all matriculants that the Faculty of the School of Medicine has the authority to drop any student from the rolls ... if circumstances of a legal, moral, health, social, or academic nature justify such a request."

We need not decide whether, as a rule, the catalog of a state university constitutes a contract between the student and the school. Given the express disclaimers in the document alleged to be a contract here, it is clear that no enforceable "contract" existed in the present case. A basic requisite of a contract is an intent to be bound, and the catalog's express language negates, as a matter of law, an inference of such intent on the part of the university. Thus, the trial court erred in granting recovery for the breach of an alleged contract based upon the medical school catalog. The appellants' contract claims are sustained.

We note that even if the catalog had in fact constituted a contract with the student, the record here demonstrates that the school officials acted in accordance with the terms and conditions of the specific catalog that the appellee agrees is applicable in his case. The catalog specifically authorized the evaluation committees, i.e., A, B, and C, to "review the academic performance of a student during the grading sequence." The committees are then allowed to take appropriate action prior to the completion of the grading sequence if they decide such action is advisable. The Dean of Medicine is given the authority to make the final decision on a recommended dismissal by the faculty for academic reasons.

Committee C acted pursuant to this authority when it evaluated appellee's academic record in order to decide whether he should be promoted for graduation. It was also within its authority in recommending to the Dean of Medicine that appellee not be promoted for graduation, but rather, be dismissed from the medical school program, given his poor academic history. The Dean, in turn, was given the authority to independently review the committee's recommendation, according to procedures established in the school catalog, and he approved the action of Committee C. The record shows that the appellants acted within their authority and the guidelines of the school catalog.

The injunction against the appellants is dissolved. The declaratory judgment entered by the trial court is reversed, and judgment is rendered against the appellee in all things.