**Katrina Guillory LAW and Booker T. Law, III, Appellants,**

v.

**WILLIAM MARSH RICE UNIVERSITY, Appellee.**

No. 14–03–00668–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 11, 2003.

Allan A. Cease, Sugar Land, for appellants.

Lara Hudgins Hollingsworth, Rusty Hardin, Houston, for appellees.

Panel consists of Justices YATES, J. HARVEY HUDSON, and FOWLER.

## OPINION

J. HARVEY HUDSON, Justice.

By this interlocutory appeal, Katrina Guillory Law and Booker T. Law, III (the "Laws") challenge the trial court's denial of their application for a temporary injunction, in which they sought to require William Marsh Rice University ("Rice") to remove an academic disciplinary suspension. We affirm.

## I. BACKGROUND

The Laws are students at Rice. During the Spring semester of 2002, the Laws were taking an organic chemistry course that was being taught jointly by Dr. James Tour and Dr. Seiichi Matsuda. Because they were in Washington D.C. attending a minority workshop with Dr. Nicholas Iammarino, the Laws took the first organic chemistry exam on February 6, 2002, there rather than on the Rice campus. On February 14, 2002, Dr. James Tours, the professor who gave the exam, wrote the Honor Council with concerns that the Laws had violated the honor code on the February 6 exam. In his letter, Dr. Tours explained that he provided the exams to Dr. Iammarino to give the Laws while they were in Washington D.C. According to Dr. Tours, Dr. Iammarino said he told the Laws to take the exams in their respective hotel rooms and return the exam to him two hours later.[1] Dr. Iammarino returned the exams to Dr. Tours on February 11, 2002. Dr. Tours based his belief that

---

1. The Laws were not married at that time.

there had been an honor code violation on the striking similarity of the incorrect answers on the exams. Dr. Tours explained that although there are very few correct solutions to a synthetic organic problem, there are "millions of possible incorrect solutions."

On April 15, 2002, Dr. Seiichi Matsuda reported another possible honor code violation involving the Laws. Dr. Matsuda gave an exam on March 27, 2002, in the same organic chemistry course. Like Dr. Tours, Dr. Matsuda noticed the similarity in the incorrect answers, explaining that "there are millions of possible incorrect answers, the chance of all of these being arrived at independently is exceedingly remote."

The Honor Council[2] decided to hear both complaints against the Laws in one hearing, which was held on April 18, 2002.[3] The Laws testified that the similarities in the answers on their exams was due to having studied together. Other evidence submitted included the letters of accusation, the Laws' written statements, the exams, the depositions (written statements) of the course professors, expert statements by two Rice professors who reviewed the exam answers, the course textbook, and the Laws' class notes. After considering the evidence, the Honor Council found both Booker and Katrina Law in violation of the honor code and recommended that they each receive an "F" in the course and a two semester suspension.

The Laws appealed the Honor Council's decision to Dr. Patricia Bass, Assistant Dean of Student Judicial Programs at Rice. Joan Shreffler, chair of the Honor Council, put together and sent to Dr. Bass an appeal packet which contained, in addition to the evidence submitted at the hearing, the chair's statement, an abstract of the hearing, and tapes of the hearing. On August 1, 2002, after reviewing the evidence from the Honor Council hearing, Dr. Bass concluded that the Laws were in violation of the honor code and upheld the grade of "F" for the course, but overturned the two semester suspension. Dr. Bass informed the Laws that any further appeal should be directed in writing to Dr. Malcolm Gillis, President of Rice by August 28, 2002.

The Laws appealed their case to Dr. Gillis, who informed them on September 18, 2002, that he was sending their case back to the Honor Council for a rehearing. On October 3, 2002, Joan Shreffler emailed the Laws allowing them to select between her and another Honor Council member, who also participated in the first hearing, to preside over the rehearing of their case. On October 11, 2002, the Laws responded that they objected to the selection of the possible chairs for their case and further stated:

> We do not necessarily believe that there is substantive proof that another trial before the same Honor Council structure, which we went before last spring, can be vindicating. We have been unfortunate in our past limited interaction with this group. We are hesitant to restart a process that we feel failed us from the outset and

---

**2.** The members of the Honor Council are Rice students.

**3.** This decision was an act of grace intended to benefit the Laws. If the Honor Council heard the complaints separately, the Laws faced the possibility of two honor code violations rather than one. A single honor code violation can result in a suspension clause, but this clause is never included on the student's transcript or permanent records, and the "F" in the course appears to be the actual grade made by the student. However, if a student is convicted of two honor code violations, a suspension clause is included on the student's transcript.

whose failures caused us to initiate the process of appeals in the first [sic]. The consequences involved with participating in the trial proceedings alone are unappealing in themselves as they distract heavily from demanding course work and take a heavy emotional toll on accused students, which is highly unattractive given our situation. Even if it were feasible to conduct another trial, it may not be realistically achievable. Therefore, we feel that in [sic] the present time we are unable to act further given the circumstances.

On November 8, 2002, Shreffler informed the Laws by email that she would be presiding over their case. Shreffler further informed the Laws that an ombudsman—a trained student volunteer who insures that the Honor Council handles the matter according to procedure and is available to answer their questions—had been appointed. Shreffler also told the Laws that an investigative hearing had been scheduled for November 13, 2002, and explained that if they were unable to attend, the meeting could be rescheduled. The purpose of the investigative meeting was to give the Laws an opportunity to review the letters of accusation, ask any questions, address the issues raised in the letters, or make no statement at all. The Honor Council would also determine at that time whether there was enough evidence to warrant proceeding to a hearing.

On November 11, 2002, the Laws' ombudsman, Kate Gurba, contacted them by email explaining what was to take place at the investigative meeting. On the evening of the November 13 investigative meeting, Booker arrived 30 minutes late and asked to speak to Shreffler alone in the hallway. Booker told Shreffler that he believed that Dr. Gillis' letter gave them the option to have or not have a hearing and, therefore,

they were choosing not to have a hearing. Shreffler told Booker that she did not believe Dr. Gillis' letter gave them a choice on whether or not there would be a hearing. Nevertheless, the Laws did not attend the investigative meeting.

On November 19, 2002, Shreffler emailed Katrina, explaining what had transpired at the investigative meeting, including her conversation with Booker. Shreffler further informed Katrina that the Honor Council had decided to proceed to a hearing to be held on November 25, 2002.

On November 21, 2002, Booker returned home from studying at school to find Katrina, who was pregnant, lying on the floor. Katrina had suffered a seizure because of her preeclampsia, a high blood pressure condition. Katrina had the baby the next day on November 22, and came home from the hospital on November 24.

On November 23, 2002, Shreffler wrote the Laws in response to Booker's letter to her in which he clarified his understanding that Dr. Gillis did, in fact, send their case back to the Honor Council. Shreffler reminded the Laws that the hearing was set for November 25, 2002, at 9:00 p.m., and pointed out that they had not contacted their ombudsman and encouraged them to do so in order to "to review evidence and to submit any evidence, including written statements or witness depositions, that you feel is relevant to your case."

On the afternoon of November 25, 2002 (the day of the hearing), Booker informed Shreffler by email that pursuant to her doctor's orders, Katrina would not be able to participate in any Rice activities and attached a copy of a note from Katrina's doctor. The note, dated November 21, 2002, stated, "Mrs. Law is currently a patient at the Women's & Children's Clinic and is 38 weeks pregnant and expected to deliver within the next four weeks. She has been advised to try and avoid stressful

situations until after delivery of her infant." That same day, Shreffler responded and stated that the Honor Council understood that Katrina would not be able to attend the hearing that night, but still encouraged her to submit any evidence she wished, including a written statement to be accepted as testimony, and suggested that Booker might want "to speak on her behalf." Although the Laws' baby was born on November 22, three days prior to the November 25 hearing, the Honor Council was not informed about the birth of the baby. Booker did not attend the hearing on November 25.

The November 25 hearing included much of the same evidence as that presented in the April 18 hearing, except that due to concerns expressed by the Laws about Rice professors serving as experts and reviewing their exams, the Honor Council, at the expense of Rice, requested that two professors from the University of Houston review the Laws' exams. After the November 25 hearing, the Honor Council again found the Laws were in violation of the honor code and recommended that the Laws each receive an "F" in the course and that Katrina receive a two semester suspension. The Honor Council, however, recommended that Booker be suspended for an additional semester (three semester suspension) because he failed to attend the hearing.

The Laws again appealed to Dr. Bass, who concluded that the Laws had violated the honor code. However, Dr. Bass reduced Booker's three semester suspension to two semesters, explaining "I am sure the Council would not have given you that sanction if they had known the reason for your failure to appear," i.e., the birth of the Laws' baby three days earlier. The Laws appealed their case to Dr. Gillis, who

ultimately upheld Dr. Bass's decision on April 16, 2003.

On May 5, 2003, the Laws filed an original petition, asserting claims against Rice for due process violations and breach of contract, and an application for a temporary injunction requesting that Rice (1) be required to remove the "F"s" from the Laws' transcripts and assign the respective grades they would have received had no disciplinary action been taken against them, and (2) be prohibited from imposing the two semester suspension, thereby allowing Booker to attend class and Katrina to graduate on May 10, 2003, and (3) be required to remove from their records the penalty of suspension, treating the Laws as students in good standing. After a hearing on May 19, 2003, the trial court denied the temporary injunction. In this interlocutory appeal, the Laws seek to have reinstated Dr. Bass's decision which overturned the two semester suspension, but not the removal of their failing grades in organic chemistry.[4]

## II. STANDARD OF REVIEW

■ A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). The purpose of a temporary injunction is to preserve the status quo pending a final trial on the merits. *Warren v. Aldridge*, 992 S.W.2d 689, 690 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Status quo is defined as the "the last, actual, peaceable, non-contested status that preceded the pending controversy." *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975).

■ An applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the re-

4. Despite the failing grade in organic chemistry, Katrina was still eligible to graduate.

lief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru Co.*, 84 S.W.3d at 204. The trial court should grant temporary injunctive relief only if the applicant demonstrates a probable right to permanent relief upon a trial on the merits and a probable injury during the pendency of the trial unless the injunction issues. *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 835 (Tex.App.-Houston [14th Dist.] 1986, no writ) (citing *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)). Probable injury includes elements of imminent harm, irreparable injury, and no adequate remedy at law for damages, while probable right includes the element of wrongful conduct. *Surko Enters., Inc. v. Borg–Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no writ). An existing remedy is adequate if it "is as complete and as practical and efficient to the ends of justice and its prompt administration as is equitable relief." *Ballenger v. Ballenger*, 694 S.W.2d 72, 76 (Tex.App.-Corpus Christi 1985, no writ). The applicant is not required to establish that he will prevail in the litigation. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Transport Co. of Tex. v. Robertson Transp., Inc.*, 152 Tex. 551, 261 S.W.2d 549, 552 (1953).

The appeal of an order either granting or denying temporary injunctive relief is interlocutory. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2003). Therefore, the merits of the underlying case are not presented for appellate review. *Davis v. Huey*, 571 S.W.2d 859, 861 (Tex.1978). The denial of a temporary injunction lies within the sound discretion of the trial court. *Walling*, 863 S.W.2d at 58. Thus, our review is limited to whether the trial court abused its discretion in either granting or denying the temporary injunction. *Brooks v. Expo*

*Chem. Co.*, 576 S.W.2d 369, 370 (Tex.1979). The trial court abuses its discretion if it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or if it misapplies the law to the established facts of the case. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). The trial court does not abuse its discretion when it bases its decision on conflicting evidence. *Davis*, 571 S.W.2d at 862. We must draw all legitimate inferences from the evidence in the light most favorable to the trial court's decision. *Bertotti v. C.E. Shepherd Co.*, 752 S.W.2d 648, 655 (Tex.App.-Houston [14th Dist.] 1988, no writ). Therefore, we may not substitute our judgment for that of the trial court. *Davis*, 571 S.W.2d at 862.

### III. PROBABLE RIGHT OF RECOVERY

The Laws assert that Rice breached its promise to afford protections promoting fundamental fairness in its judicial proceedings and to conduct those proceedings impartially. As Rice acknowledges, the relationship between a private school and its students "has by definition primarily a contractual basis," *Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex.App.-Houston [1st Dist.] 1989, writ denied), but the issue here is what terms comprise that contractual relationship. *See Goodman v. President & Trs. of Bowdoin College*, 135 F.Supp.2d 40, 56 (D.Me.2001) (having determined that student and school had contractual relationship, court explained "[t]he more complicated question for the Court concerns whether this contractual relationship included the Student Handbook terms, the alleged violation of which forms the basis of Plaintiff's claims against Bowdoin"); *Villarreal v. Art Inst. of Houston, Inc.*, 20 S.W.3d 792, 797–98 (Tex.App.-Corpus Christi 2000, no pet.) (having determined that, at minimum, implied contract existed that school would provide student with educational opportunity and confer degree in

consideration for student's agreement to successfully complete degree requirement, abide by school's guidelines, and pay tuition, court stated student had to prove existence of contract containing terms upon which she based her suit).

The First Court of Appeals held that a school's catalog constitutes a written contract between the educational institution and the student, where entrance is had under its terms. *See University of Tex. Health Sci. Ctr. at Houston v. Babb*, 646 S.W.2d 502, 506 (Tex.App.-Houston [1st Dist.] 1982, no writ). However, other cases have distinguished the holding in *Babb*, observing that the school catalog in that case contained an express statement allowing a student who began under the terms of a certain catalog to continue the program under that same catalog. *See Southwell v. University of Incarnate Word*, 974 S.W.2d 351, 355–56 (Tex.App.-San Antonio 1998, pet. denied); *Tobias v. University of Tex. at Arlington*, 824 S.W.2d 201, 211 (Tex.App.-Fort Worth 1991, writ denied); *Eiland*, 764 S.W.2d at 838. However, where there is an express disclaimer negating any intent by the school to be bound by the terms of its catalog or handbook, no enforceable contract exists. *See Southwell*, 974 S.W.2d at 355–56 (holding that school bulletin did not create contract where it stated "[t]his bulletin is for informational purposes only. . . . The college reserves the right to change or alter any statement herein without prior notice," signifying lack of intent by Incarnate Word to be bound by terms of bulletin); *Tobias*, 824 S.W.2d at 211 (holding that where catalog contained express language that "[t]he provisions of this catalog do not constitute a contract, express or implied, between any applicant, student, or faculty member and The University of Texas at Arlington or The University of Texas System," negating inference of intent by school to be bound its terms, no contract existed); *Eiland*, 764 S.W.2d at 838 (holding that where catalog contained express notice that "[t]he provisions of this catalog are subject to change without notice and do not constitute an irrevocable contract between any student . . . and the University of Texas Medical School at Galveston," no enforceable contract existed because express language negated any intent by school to be bound).

The Laws contend they have tendered performance of their contract with Rice because they have paid tuition and attended the required courses as set forth in the Rice catalog. "[W]here a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists." *Southwell*, 974 S.W.2d at 356. However, the Laws assert Rice breached their contract by conducting the second disciplinary hearing without their attendance. A review of the Laws' petition reflects that the crux of their breach of contract claim is that Rice breached its contractual duty by failing to provide them a fair process in its disciplinary proceedings, not that they are not getting the education for which they paid.

Rice argues the individual procedures set forth in the Blue Book[5] do not confer specific contractual rights on any student. The Blue Book specifically states:

> The procedures outlined in this booklet are intended to aid the Honor Council in its efforts to ascertain the

5. The booklet titled, "The Honor System Rice University," is commonly referred to as the "Blue Book."

facts of a matter and to reach a just decision. *They do not confer any contractual rights on the accused.* Circumstances can differ greatly between cases, and the Chair of the Council or the Assistant Dean of Student Judicial Programs *may need to modify the procedures in a particular case* in order to reach a timely and just decision.[6]

As in *Southwell, Tobias,* and *Eiland,* the above language in the Rice Blue Book expressly negates any intent by Rice to be contractually bound by its disciplinary procedures. Thus, the specific procedures set forth in the Blue Book are not an enforceable contract between Rice and the Laws.

In the absence of a valid contract, either express or implied, between Rice and the Laws with regard to the procedures provided in the Honor System, the Laws have not shown a probable right to recovery in a trial on the merits on their claim for breach of contract.[7]

## IV. PROBABLE INJURY

■■■ The Laws also contend they have no adequate remedy at law because their damages cannot be measured in monetary terms. To establish there is no adequate remedy at law, the Laws must show that an award of damages would be inadequate for the harm suffered. *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 578 (Tex.App.-Austin 2000, no pet.). Katrina, who was offered a job with Teach for America, asserts she will not be able to participate in that program unless she graduates. Booker will not be able to return to Rice for two semesters and, therefore, will not have the opportunity to pursue any job with his degree qualifications for at least a year. The Laws contend they will not be able to financially manage their family. Such harm, however, can be compensated by monetary damages. *See Ben–Yonatan v. Concordia College Corp.,* 863 F.Supp. 983, 986 (D.Minn. 1994) (denying motion for preliminary injunction and holding student's allegation of loss of one year's compensation as medical doctor due to one year's suspension was compensable by monetary damages, thereby precluding threat of irreparable harm).

## V. IRREPARABLE HARM

■■■ The Laws also claim they will suffer irreparable harm if the two semester suspension is not removed. Katrina argues she will be stigmatized if a notation is placed on her record that she was suspended because of an academic violation. Booker asserts that if the academic suspension remains on his record, he will be prevented from pursuing graduate studies. Contrary to the Laws' allegation that their academic suspension will be noted on their academic record, the Laws' ombudsman informed them that the suspension and reason for the failing grade will not appear on their transcript or other permanent record:

> ... The reason for your F in this course will not be noted on your transcript; it will look as though you received this grade on your own.
>
> A suspension clause has also been attached to your record. This is an internal note for our records that you have been found in violation of the Honor Code. If you should come before us at some point in the future and are again found in violation, this clause allows us to go above our Consensus Penalty Structure when decid-

---

6. Emphasis added.

7. Although the Laws asserted a due process claim in their original petition, they have not addressed that claim in this appeal.

ing on an appropriate penalty. This clause will not appear on your transcript or any other permanent records.

According to their ombudsman, the suspension clause is noted only on Rice internal records and will become relevant only if they are found in violation of the honor code on another occasion. The Laws did not offer any evidence to the contrary and, thus, have failed to show irreparable harm.

## VI. PRESERVING THE STATUS QUO

 Finally, the relief the Laws seek is beyond just preserving the status quo pending a trial on the merits. The status quo to be preserved is "the last, actual, peaceable, non-contested status that preceded the pending controversy." *Southwestern Bell Tel. Co.*, 526 S.W.2d at 528. The Laws contend the last, actual, peaceable, non-contested status was Dr. Bass's decision to overturn the two semester suspension. We disagree. The Laws appealed that decision to Dr. Gillis. Instead, the last, actual, peaceable, non-contested status is Dr. Gillis' decision to uphold Dr. Bass's decision after the second disciplinary hearing, *i.e.*, the failing grade in organic chemistry and the two semester suspension. *See Edgewood Indep. Sch. Dist. v. Paiz*, 856 S.W.2d 269, 271 (Tex.App.-San Antonio 1993, no writ) (holding status quo was school district's decision to prohibit student who had not passed TAAS test from participating in graduation ceremonies).

Moreover, in vacating the temporary injunction, the *Paiz* court further explained that the trial court's order reversed the status quo, thereby providing the plaintiff "the complete relief he seeks and deprives the school district of any right to contest the matter before the passage of time renders it moot and unremediable." *Id.* Similarly, requiring Rice to remove the two

semester suspension would allow Katrina to graduate rendering moot Rice's right to take disciplinary action against her.

The trial court did not abuse its discretion in denying the Laws' application for a temporary injunction. Accordingly, the judgment of the trial court is affirmed.