# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00212-CV

---

**Texas State University President Denise M. Trauth; Texas State University Assistant Vice President for Research and Federal Relations Michael Blanda; Texas State University Registrar Louis E. Jimenez, Jr.; and Texas State University Regents William F. Scott, David Montagne, Charlie Amato, Duke Austin, Garry Crain, Veronica Muzquiz Edwards, Dionicio Flores, Nicki Harle, and Alan L. Tinsley, In their Official Capacities, Appellants**

v.

**K. E., Appellee**

---

### FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
### NO. 15-0116, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

---

## CONCURRING AND DISSENTING OPINION

I respectfully dissent because I would hold that the Texas State University (TSU) System Board of Regents (the Board) has the authority to revoke a former student's degree for academic dishonesty so long as, as relevant here, it affords due process under the United States Constitution and due course of law under the Texas Constitution. I would sustain the University officials' second issue and dismiss K.E.'s authority-to-revoke claims.

I further respectfully dissent in part because K.E.'s requested declaratory and injunctive relief includes some retrospective remedies, which are barred by sovereign immunity. I would sustain in part and overrule in part the University officials' first issue, dismiss the retrospective-only remedies, and remand what remains for further proceedings.

## I. UNIVERSITY AUTHORITY

The University officials contend that TSU may revoke a degree for academic dishonesty. The Board's rules base the authority on academic dishonesty and recognize the check of due process: "When the Board determines that a degree . . . was obtained through fraud, mistake, or academic dishonesty, the Board may revoke the degree . . . , provided the Component has afforded the degree . . . recipient due process of law."

In the TSU president's letter to K.E. about the Board's final decision, the president confirmed that the Board restricted its claimed statutory authority to revoke to Education Code section 95.21: "[P]ursuant to authority stated in Texas Education Code, Section 95.21 and Board Rules and Regulations, Chapter I, Paragraph 2.3, it was ordered that the recommendation of the President to revoke the degree of K.E. be affirmed." Because the Board restricted itself to Section 95.21, I will too.[1]

Section 95.21(a) tasks the Board with "the general control and management of the universities in the system" and authorizes it to

> erect, equip, and repair buildings; purchase libraries, furniture, apparatus, fuel, and other necessary supplies; employ and discharge presidents or principals, teachers, treasurers, and other employees; fix the salaries of the persons employed; and perform such other acts as in the judgment of the board contribute to the development of the universities in the system or the welfare of their students.

Two features of this statute apply here: (1) the authorities for the "general control and management of the universities in the system" and "perform[ing] such other acts as in the

---

[1] Education Code section 95.24 provides that the Board "may determine . . . the conditions for the award of certificates and diplomas." The University officials raise plausible arguments that a condition for the award of a TSU degree can be future revocation for academic dishonesty uncovered. I express no further opinion about these arguments because the Board restricted itself to Section 95.21.

judgment of the board contribute to the development of the universities in the system" and (2) the authorization to "perform such other acts as in the judgment of the board contribute to . . . the welfare of [the universities'] students."

### A.

The majority opinion's analysis ignores the student-welfare authorization. When a state actor is authorized to perform certain acts without restriction on how the actor may perform them, the actor generally has unbounded discretion to perform the acts. *See Hall v. McRaven*, 508 S.W.3d 232, 241–43 (Tex. 2017). In *Hall*, the Supreme Court of Texas considered a University of Texas (UT) System Board of Regents grant of authority to the system's chancellor. The grant rested on the board's "expansive authority," conferred by statute, "to 'govern, operate, support, and maintain' the System." *Id.* at 235 (characterizing and quoting Tex. Educ. Code § 65.31(a)). Under that statutory authority, plus those for providing policy direction to UT and setting admissions standards, the board authorized the chancellor to "determine whether a Regent may review information that is protected by [the Family Educational Rights and Privacy Act (FERPA)]." *Id.* at 242. The Court stated that the authorization was "unrestricted" regarding how the chancellor could make the FERPA determination: "[h]is discretion in making that determination is otherwise unconstrained." *Id.*; *see also id.* at 239 ("An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority."). Because the authorization did not restrict how he could interpret federal privacy law—even by restricting him from applying the law

3

erroneously—the chancellor's "discretion to interpret collateral federal privacy law [was] 'absolute.'" *Id.* at 242–43.

Here, the University officials argue that revoking a degree for academic dishonesty "contribute[s] to . . . the welfare of [TSU's] students." *See* Tex. Educ. Code § 95.21(a). Their briefing quotes the United States Court of Appeals for the Tenth Circuit to argue that revoking a degree for academic dishonesty protects TSU's students from harms to their future degrees and TSU's graduates from harms to their degrees:

> Academic degrees are a university's certification to the world at large of the recipient's educational achievement and fulfillment of the institution's standards. To hold that a university may never withdraw a degree, effectively requires the university to continue making a false certification to the public at large of the accomplishment of persons who in fact lack the very qualifications that are certified. Such a holding would undermine public confidence in the integrity of degrees, call academic standards into question, and harm those who rely on the certification which the degree represents.

*Hand v. Matchett*, 957 F.2d 791, 794–95 (10th Cir. 1992) (applying New Mexico law and quoting *Waliga v. Board of Trs. of Kent State Univ.*, 488 N.E.2d 850, 852 (Ohio 1986)). Their briefing also relies on *Olsson v. Board of Higher Education*, which both recognized that a degree is a university's "certifying to society that the student possesses all of the knowledge and skills that are required by his chosen discipline" and cautioned that guarding public confidence in degrees makes it "essential" to allow universities to exercise "the sound judgment of the professional educators" to monitor student achievement. 402 N.E.2d 1150, 1153 (N.Y. 1980). The University officials similarly argued that a degree amounts to a university's ongoing "representation to the academic community, to employers, and to the public that the recipient" met the academic requirements for the degree. Thus, they say, forbidding the Board from revoking a degree for academic dishonesty "would undermine public confidence in Texas State

4

degrees." TSU's degrees are meaningful to the world only if TSU can enforce the conditions under which it granted the degree by revoking it if it was obtained by academic dishonesty.

K.E.'s own arguments dovetail with these. She views her revoked degree as an ongoing harm because of TSU's ongoing relationship with the degrees that it confers:

> The University's continued disavowal of the degree's legitimacy constitutes an ongoing harm to K.E. for which prospective reinstatement thereof would serve to make K.E. whole again.
>
> . . . .
>
> . . . Enforcing the University's acknowledgement of K.E.'s doctoral degree as valid serves to place the world on notice that she has achieved certain academic milestones and that her qualifications are at the highest level when evaluated by prospective employers.
>
> . . . .
>
> . . . [I]t is not the University's singular, past act of revoking K.E.'s degree, but, rather, the continuing representation to the outside world that her degree is illegitimate . . . .

Because of these competing arguments, the majority opinion should not ignore Section 95.21(a)'s student-welfare authorization.

I believe the proper view of that authorization is that it includes authority to revoke a degree for academic dishonesty. That is because the statute does not limit the Board's discretion in performing acts simply that "contribute" to TSU's students' welfare, instead making the authority answerable only to "the judgment of the board" itself. *See* Tex. Educ. Code § 95.21(a); *see also Splawn v. Woodard*, 287 S.W. 677, 681–82 (Tex. App.—Austin 1926, no writ) (considering it "clear" that "full discretionary powers over the buildings" at UT had been vested in UT's board by legislative grants of authority merely to "spend[] the income from the permanent fund for 'permanent improvements to be erected on the campus of [UT]'"

5

and to "mak[e] contracts with 'architects, planmakers, landscapers, or draftsmen,' . . . concerning 'all contracts for the construction or erection of such permanent improvements'"). The student-welfare authorization is an unrestricted one, which *Hall* says a state actor may therefore pursue with full discretion. *See* 508 S.W.3d at 241–43. The University officials have persuasively argued that the law must allow TSU to revoke degrees for academic dishonesty if doing so, in "the judgment of the board," "contribute[s] to" TSU's students' "welfare" by protecting the value of their degrees. *See* Tex. Educ. Code § 95.21(a).

### *B.*

The only part of the majority opinion that might speak to this is its concern about the outer edges of Section 95.21(a)'s broad grants of authority. This part of the majority opinion specifically addresses the other statutory language that applies here—the authorities for the "general control and management of the universities" and "perform[ing] such other acts as in the judgment of the board contribute to the development of the universities." *See id.*

The majority opinion says that these authorizations are only "*general* responsibilities" that only "concern[] . . . the day to day operations of the university and the management of its personnel" and that they are thus "limited to interests that are material to the purpose of section 95.21, which is to authorize the Board of Regents to manage the operations and development of the university system." *Ante* at 8–9. The majority opinion asserts that interpreting the authorizations to mean anything more would make superfluous Section 95.24, which involves the authority to grant degrees, and other statutes. *Ante* at 9–11. The majority opinion also assumes that Texas state universities are mere state agencies for all purposes,

6

thus imposing on the universities all the same limits on authority that restrain state agencies. *See ante* at 7–11.

*1.*

There are three problems with this analysis. First, its statement that the purpose of Section 95.21(a) is "limited to . . . manag[ing] the operations and development of the university system" reads out of the statute "the universities." The statute provides that the Board may "perform such other acts as in the judgment of the board contribute to the development of the universities in the system." Tex. Educ. Code § 95.21(a). Section 95.21(a) is not merely about System "*general* responsibilities." It is about each of the System's universities too.

*2.*

Second, whatever the outer edges of Section 95.21(a) may be, the heart of the authority conferred involves TSU's authority to make academic decisions. As the University officials note, a body of law in Texas and elsewhere has developed around what "academic decisions" a university is empowered to make.

The University officials argue that a university's decision-making about whether to revoke a degree is inherently "an academic decision." In their post-submission brief, they further addressed the academic considerations involved: "In a revocation determination, the ultimate issue is not simply whether the degree-holder committed fraud, but rather, in light of the fraud, whether she has met the university's standard of educational achievement in order to possess a degree." They insist that K.E. broke standards of academic achievement when she "falsified empirical, field research data, which formed the bases for [her] doctoral dissertation in a hard science," and they rely on *Merrow v. Goldberg*, among other cases, as support for courts

7

deferring to academic decisions: "The decision made by [state college] . . . , that plaintiff had not done sufficient work to earn the credits previously awarded him, was an academic decision and we evaluate it as such." 672 F. Supp. 766, 772 (D. Vt. 1987).

In Texas, the "academic decisions" that statutes have impliedly authorized universities to make shows that generalized statutory grants of authority to universities are extraordinarily broad. Three cases illustrate the point. In *Alcorn v. Vaksman*, a student sued certain University of Houston (UH) officials for dismissing him from UH's history doctoral program. 877 S.W.2d 390, 393 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (en banc). The First Court of Appeals affirmed a ruling that the student suffered a denial of due process but concluded that UH's dismissal authority came from its general statutory authorization that "[t]he governance, control, jurisdiction, organization, and management of the University of Houston System is hereby vested in the" UH board. *See* Tex. Educ. Code § 111.20(c), *cited in Alcorn*, 877 S.W.2d at 403 n.5 ("The dismissal of students at the University of Houston is within the appellants' scope of authority. Tex. Educ. Code Ann. § 111.20(c).").

The determination whether to dismiss the student under this generalized statutory authorization, in good faith and while respecting due process, was an "academic decision": "'[W]hen courts review the substance of academic decisions . . . they should show great respect for the teacher's professional judgment.' This sound rule is based on the belief that university administrators, not judges, should make academic decisions needed to run a university." *Alcorn*, 877 S.W.2d at 397 (internal citation omitted) (quoting *Clements v. County of Nassau*, 835 F.2d 1000, 1005 (2d Cir. 1987)); *see also Mahavongsanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir. 1976) ("[W]e know of no case which holds that colleges and universities are subject to the supervision or review of the courts in the uniform application of their academic standards.").

8

In *Eiland v. Wolf*, a student sued over his dismissal, for low grades and a low score on a national exam, from the University of Texas Medical Branch at Galveston (UTMB). 764 S.W.2d 827, 828–29, 834, 836 (Tex. App.—Houston [1st Dist.] 1989, writ denied). The First Court of Appeals rendered a take-nothing judgment against the student because there was "*some* evidence showing an academic basis for the [officials'] exercise of professional judgment in dismissing" him. *Id.* at 836, 839. The court said that dismissing him was an academic decision, which courts "are not readily adapted to . . . review." *Id.* at 833 (citing *Board of Curators v. Horowitz*, 435 U.S. 78, 90 (1978)). The court cautioned judges to "accord great deference" to academic decisions lest they unwisely "further enlarge the judicial presence in the academic community." *Id.* (citing and quoting *Horowitz*, 435 U.S. at 90); *see also University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 931 (Tex. 1995) ("Judicial interposition in the disciplinary decisions of state supported schools raises problems requiring care and restraint." (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))); *Olsson*, 402 N.E.2d at 1153 ("Th[e] judicial reluctance to intervene in controversies involving academic standards is founded upon sound considerations of public policy."). The only statutory language identified as supporting the "academic decision" of dismissal was the board's authority "to prescribe degree programs and to promulgate university rules and regulations," *see Eiland*, 764 S.W.2d at 837, which today's majority opinion would consider too general to allow for the dismissal of a student.

The Supreme Court of Texas has similarly recognized universities' broad authorities to make "academic decisions," especially regarding academic dishonesty. In *Than*, a trial court ruled that the UT Medical School violated due process in the hearings it held to dismiss a student for academic dishonesty. 901 S.W.2d at 929. The trial court enjoined the school to change the student's "F" grade to a "B," "treat [him] as a student who graduated in

9

good standing," and issue him a diploma. *Id.* The Supreme Court pared down the trial court's injunction because of the school's need to make "academic decisions" on its own and held that much of the injunctive relief granted by the trial court impermissibly encroached on UT's academic decisions. *Id.* at 933–34. So the Court limited the injunction to simply removing the "F" and removing any expulsion notations:

> [T]he injunctive relief represents unwarranted judicial interference with the educational process. The courts should tread lightly in fashioning remedies for due process violations that affect the academic decisions of state-supported universities. What grade should be awarded and whether UT issues Than a diploma should be determined by university officials after notice and hearing.

*Id.* at 934; *see also Mahavongsanan*, 529 F.2d at 450 (stating that universities must enjoy "wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements" (citing *Militana v. University of Miami*, 236 So.2d 162, 164 (Fla. Dist. Ct. App. 3d Dist. 1970) (per curiam))); *Cieboter v. O'Connell*, 236 So.2d 470, 471–73 (Fla. Dist. Ct. App. 1st Dist. 1970) (denying mandamus sought by graduate student against University of Florida president because president and faculty were within their academic authority, "free[] from interference from other noneducational tribunals," to require graduate student to receive personal counseling for unspecified "misconduct" before considering student's dissertation (citing *Connelly v. University of Vt. & State Agric. Coll.*, 244 F. Supp. 156, 160 (D. Vt. 1965))). The Court required the remanded due-process-compliant hearing to take place within the school, rather than in the courts, thus recognizing universities' capacity to afford due process in their hearings. *See Than*, 901 S.W.2d at 934; *see also Merrow*, 672 F. Supp. at 773 ("As for the composition of the [credit-revocation] tribunal, '[a] graduate or professional school is, after all

10

the best judge of its students' academic performance and their ability to master the required curriculum.'" (quoting *Horowitz*, 435 U.S. at 85–86 n.2)).

In all, *Than*, *Eiland*, and *Alcorn* show Texas courts' history of acknowledging generalized statutory grants as giving universities extraordinarily broad academic authorities, while still bounded by due process.[2]

*3.*

Third, the majority opinion assumes that state universities are mere state agencies for all purposes. They are not. *See, e.g.*, Tex. Gov't Code § 2001.003(7)(E) (no "institution of higher education" is a "state agency" under the Texas Administrative Procedure Act). They are unique entities with corresponding authorities inherent in their status as a university.

Even K.E. argues that TSU is no mere state agency. She argues that "[i]f the Legislature had intended for the University to be such [a state] agency, it would have made it one." Longstanding Texas law likewise shows that universities have authorities inherent in their status as universities, for three reasons.

*a.*

First and most notably, this Court has recognized universities' inherent authorities. In *Morris v. Nowotny*, a former student sued UT for barring him from readmission to the university and from the campus. 323 S.W.2d 301, 302, 304–05, 308 (Tex. App.—Austin

---

[2] It is no distinction to say that *Than*, *Eiland*, and *Alcorn* cannot speak to degree revocation because a degree involves a property interest while pre-degree participation in an academic program does not. Whether a plaintiff is asserting a property interest is part of a due-process analysis. *See, e.g.*, *Board of Curators v. Horowitz*, 435 U.S. 78, 82 (1978); *University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995). I do believe that due process restricts universities' authority to revoke a degree for academic dishonesty.

11

1959, writ ref'd n.r.e.).  This Court examined whether UT could bar the student's readmission, including from the campus premises, and located UT's relevant authority either by implication from the UT statute's "management and government of the University" or in the university's inherent authority:

> The government of the University of Texas is vested in a Board of Regents with authority to "enact such by-laws, rules and regulations as may be necessary for the successful management and government of the University."  We are not advised as to the nature of rules and regulations, if any, adopted under the authority of these statutes but without such knowledge it is our opinion that the above statutes imply the power and if they do not so imply then that the power is inherent in University officials to maintain proper order and decorum on the premises of the University and to exclude therefrom those who are detrimental to its well-being.

*Id.* at 312 (internal citation omitted) (quoting predecessor statute to Tex. Educ. Code § 65.31). Rather than holding that UT, as a public landowner, had the right to bar certain people from public grounds, this Court held that UT's relevant authority was implied by the "rules and regulations" statute or inherent in its status as a university. *See also Esteban v. Central Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969) ("We . . . hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its property; that it may expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded . . . ; and that the courts should interfere only where there is a clear case of constitutional infringement."); *Waliga*, 488 N.E.2d at 852–53 (reviewing university's "inherent" authority to revoke degrees and noting that courts refuse to interfere with "fundamental university functions").

12

*b.*

Next, Texas law has recognized inherent university authority by recognizing academic authorities in private universities, which do not exist or enjoy authority because of statutes like state universities do. For example, the Second Court of Appeals affirmed a take-nothing summary judgment rendered against a Texas Christian University (TCU) student who had sued TCU officials for negligence for alleged abuse and mistreatment at the nursing school. *Guinn v. Texas Christian Univ.*, 818 S.W.2d 930, 931 (Tex. App.—Fort Worth 1991, writ denied). The court concluded that the student had alleged no "recognized cause of action *against an educational institution*." *Id.* at 933–34 (emphasis added). It reached this conclusion by recognizing in TCU the familiar "academic decision" authorities that state universities enjoy. The court declined "to intrude into a university's educational process, and to meddle in its student evaluation procedures and decision-making" because courts "should show great respect for a faculty's professional judgment" in what "is genuinely an academic decision" and refuse to "override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (citing *Horowitz*, 435 U.S. at 92). The court then cited *Eiland* as an example of a court following the "mandate" to defer to universities' academic decisions. *Id.* at 933–34.

What other source for TCU's authorities could there be? Not statutes. Not incorporation documents—we don't let corporations harm individuals simply because of their corporate status. As for contract, although private universities' relationships with their students ordinarily arise in contract, *see, e.g.*, *Eiland*, 764 S.W.2d at 838 ("[T]he relationship between a private school and its student has by definition primarily a contractual basis."), nothing in *Guinn* sets forth the terms of TCU's contract with the student or applies any such terms. Instead, the

13

court's by-now-familiar invocation of "academic decision" authorities, including citing *Horowitz* and *Eiland*, signals that it is something endemic to private and public universities alike—and not their kaleidoscope of course catalogs—that authorized TCU's acts. It was its status as a university. *Guinn*, 818 S.W.2d at 932–34; *see also Mahavongsanan*, 529 F.2d at 450 (applying private-university precedent, *Militana*, 236 So.2d at 164, to uphold public university's "wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements").

*c.*

The Legislature adheres to the inherent-authority view of universities. *See, e.g.*, Tex. Educ. Code § 51.352(a) ("It is the policy of this state that the governing boards of institutions of higher education . . . shall exercise the traditional and time-honored role for such boards as their role has evolved in the United States and shall constitute the keystone of the governance structure."). The majority opinion's contrary view, limiting what Texas state universities may do to the bare nouns and verbs in their authorizing statutes, will have significant harmful ripple effects on the Legislature's structuring of the state's public universities, as noted by the University officials.

For example, all agree that TSU may grant degrees, but we might differ on why. The majority opinion apparently would locate that authority only in the words of Education Code section 95.24, which authorizes the Board to "determine . . . the conditions for the award of certificates and diplomas, and the authority by which certificates and diplomas are signed." We know this because of the reasoning by which the opinion rejects the University officials' revocation argument from the same statute. *Cf. ante* at 10–11. That is, while the University

14

officials say that revoking a degree for academic dishonesty "is a 'necessary corollary' to a university's right to issue the diploma," the majority opinion rejects this argument by saying that "the grant of authority to award certificates and diplomas" is not "*defeated* absent an attendant authority to revoke the certificate or diploma at a later date." *Ante* at 10–11. If the specific nouns and verbs are not in the statute, the majority opinion holds, then the university apparently cannot do it, unless its absence would defeat an express authorization.

What of other universities' authority to grant degrees? A university's express authorizations are not "defeated" if the university cannot grant degrees, for Texas state universities may offer non-degree-granting academic programs. *See, e.g.*, Tex. Educ. Code §§ 51.338(a), 51.340(a), 65.31(f), 130.0034(b), 135.52(c). Under the majority opinion's view then, a Texas state university may grant degrees only if a statute expressly allows it to.

These state universities enjoy no express statutory authorization to grant degrees:

- Texas A&M University, *see id.* §§ 85.01–.71, 86.01–.82;
- Midwestern State University, *see id.* §§ 103.01–.11;
- Texas Southern University, *see id.* §§ 106.01–.55; and
- Texas Tech University, *see id.* §§ 109.001–.170.[3]

The degrees of hundreds of thousands of Aggies, Mustangs, Tigers, and Red Raiders are in danger because the majority opinion views university authority as limited virtually to express statutory language alone.

As to TSU, the Board "may erect, equip, and repair buildings." *Id.* § 95.21(a). But the statute does not say that the Board may tear down buildings. This is the portion of the

---

[3] Compare to Angelo State University, part of the same university system, which does enjoy an express statutory authorization to grant degrees. Tex. Educ. Code §§ 109A.001–.002.

15

statute most specific to buildings, so the majority opinion apparently would consider the Board unable to tear down buildings. *See ante* at 7. ("Notably, the specific statutory provision dealing with diplomas and certificates states that the University officials may determine 'the conditions for the award of certificates and diplomas' but includes nothing that could reasonably be construed as an express grant of authority to strip a former student of a diploma or degree after it has been conferred."). This leads to the absurd result that TSU may never tear down a building to build something else in its place. *But see Splawn*, 287 S.W. at 681–82 (considering it "clear" that "full discretionary powers over the buildings" at UT had been vested in UT's board by legislative grants of authority merely to "spend[] the income from the permanent fund for 'permanent improvements to be erected on the campus of [UT]'" and to "mak[e] contracts with 'architects, planmakers, landscapers, or draftsmen,' . . . concerning 'all contracts for the construction or erection of such permanent improvements'").

We must assume that the Legislature does not create absurdities. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008) (prohibiting statutory interpretations that "lead[] to absurd results"); *Texans Uniting for Reform & Freedom v. Saenz*, 319 S.W.3d 914, 923 (Tex. App.—Austin 2010, pet. denied) (same). When it gave some universities an express statutory authority to grant degrees but did not give Texas A&M, Midwestern State, Texas Southern, and Texas Tech the same express authority, did it intend that those universities may not grant degrees? No. Those universities inherently may grant degrees.

Universities also inherently may revoke degrees for academic dishonesty. Inherent authority—not states' differing statutory-interpretation schemes—is the import of the precedents stemming from the Supreme Court of Ohio's *Waliga*. The court in *Waliga* provided two justifications, both of which apply to TSU, for universities' "self-evident . . . inherent

16

authority to revoke an improperly awarded degree." 488 N.E.2d at 852. First, and as discussed above as complementing TSU's student-welfare authorization, was the justification about "undermin[ing] public confidence in the integrity of degrees, call[ing] academic standards into question, and harm[ing] those who rely on the certification which the degree represents" because the degree is a university's ongoing representation to the world. *Id.* Second, English universities, precursors to America's, have enjoyed inherent power to revoke degrees since at least 1723. *Id.* (citing and quoting *R v. University of Cambridge* (1723) 8 Mod. Rep. (Select Cases) 148 (K.B.)). "The English common law provides precedential rules of decision in Ohio and other states." *Id.* Texas is one of them. *See* Tex. Civ. Prac. & Rem. Code § 5.001(a); *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647–48 (Tex. 2020).

Courts outside Ohio have relied on *Waliga* to support degree revocation, or credit revocation, under the law of:

- Maryland, *see Doe v. Salisbury University*, 107 F. Supp. 3d 481, 492–93 (D. Md. 2015);

- New Mexico, *see Hand*, 957 F.2d at 794–95;

- North Dakota, *see Brown v. State ex rel. State Board of Higher Education*, 711 N.W.2d 194, 198 (N.D. 2006);

- Tennessee, *see Faulkner v. University of Tennessee*, No. 01-A-01-9405-CH00237, 1994 WL 642765, at *5–6 (Tenn. Ct. App. Nov. 16, 1994);[4]

- Vermont, *see Merrow*, 672 F. Supp. at 771–74; and

- Virginia, *see Goodreau v. Rector and Visitors of the University of Virginia*, 116 F. Supp. 2d 694, 703 (W.D. Va. 2000).

---

[4] Tennessee, unlike Texas, appears to subject its universities to its state administrative-procedure act. *Compare Faulkner v. University of Tenn.*, No. 01-A-01-9405-CH00237, 1994 WL 642765, at *1 (Tenn. Ct. App. Nov. 16, 1994), *with* Tex. Gov't Code § 2001.003(7)(E).

Texas's state universities are no less heirs of England's than our sister states' universities are. When our Legislature creates a university, it creates an entity that inherently may grant degrees and revoke them for academic dishonesty.

## II.   RETROSPECTIVE REMEDIES

The University officials contend in their first issue that K.E.'s claims are barred because they seek only retrospective remedies.  K.E. pleaded for seven declarations and three injunctions.  She asked the trial court to declare that

1. she has a constitutionally protected property and liberty interest in her Ph.D.;

2. the University Officials acted without authority when they revoked it;

3. they are not authorized to revoke a degree;

4. the 2006 TSU catalog in effect when she was a graduate student constitutes a binding contract with TSU;

5. TSU may not enforce against her any rules amended, modified, or adopted after she graduated because doing so would be unconstitutional and unlawful;

6. the disciplinary-proceedings part of the 2006 catalog violates due process; and

7. the disciplinary proceedings against her violated due process.

As to the injunctions, she asked the trial court to

1. order the Board "to take whatever action is necessary to reinstate" her degree and to remove any notation suggesting that it was revoked;

2. "declare the [University officials] have . . . deprived her of her liberty and/or property interests without the procedural due process protections she is entitled to under the Texas Constitution"; and

3. (i) declare that the TSU registrar did the same, (ii) order the registrar to reinstate her degree, and (iii) order the registrar to remove any notation suggesting that it was revoked.

The University officials argue that all of these requested remedies address only "[a]n already-complete, one-time government action"—the revocation of her degree for academic dishonesty; that they "seek[] to go back in time and undo past action, rather than to bring [the University officials] into compliance with statutory law"; and that they "reach[] back in time to create a legal norm that was not evident to the [University officials] at the time they acted."

*A.*

A retrospective remedy is barred by sovereign immunity even when the claim leading to that remedy is not otherwise immunity-barred. "A claim seeking to require a state official to comply with statutory or constitutional provisions"—an "*ultra vires*" claim—"is not prohibited by sovereign immunity." *Texas Educ. Agency v. American YouthWorks, Inc.*, 496 S.W.3d 244, 255–56 (Tex. App.—Austin 2016) (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)), *aff'd sub nom., Honors Acad., Inc. v. Texas Educ. Agency*, 555 S.W.3d 54 (Tex. 2018). For a successful *ultra vires* claim, a court may award "prospective injunctive remedies . . . against government actors who violate statutory or constitutional provisions." *Heinrich*, 284 S.W.3d at 369. However, even under a proper *ultra vires* claim, sovereign immunity still bars "retrospective relief, whether monetary or otherwise." *American YouthWorks*, 496 S.W.3d at 256 (citing *Heinrich*, 284 S.W.3d at 373–77); *see also Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 760 (Tex. 2011) (per curiam) ("Generally, however, only prospective relief is available; retroactive relief dictated by a court is not."). Whether a remedy is prospective or retrospective is "measured from the date of injunction." *Heinrich*, 284 S.W.3d at 376.

In *American YouthWorks*, holders of school charters issued by the State sued the Commissioner of Education for revoking their charters based on their schools' low performance ratings, as the Commissioner calculated them. 496 S.W.3d at 252–55. The charter holders brought *ultra vires* claims, alleging that the Commissioner exceeded his authority under the statutes empowering him to revoke charters and to calculate performance ratings. *Id.* at 265–66. This Court held that sovereign immunity barred declaratory remedies stemming from these *ultra vires* claims because the remedies "seek or would require forms of relief that are retrospective in nature and [are], thus, impermissible." *Id.* at 265 (citing *Heinrich*, 284 S.W.3d at 376). This Court reasoned that the declarations would affect not only future charter revocations but also the Commissioner's already completed ratings calculations:

> the actual relief they seek—ultimately that their charters not be revoked under this particular revocation decision, but also that they be allowed to challenge past accountability ratings on which that decision was based—necessarily requires somehow undoing or changing prior acts or events. The Charter Holders' . . . claims . . . would require changing—either by granting an additional review of the performance ratings or, in at least one instance, actually awarding a different performance rating—the Charter Schools' past performance ratings in the hope that the rating change would remove the school(s) from the mandatory revocation list. This is the necessary relief sought here because, unless the prior unacceptable or unsatisfactory performance ratings were to change, the Charter Schools remain subject to mandatory revocation under [statute].

*Id.* at 265–66.

In *Heinrich*, by contrast, immunity did not bar the requested injunction that would order municipal officials to calculate future pension benefits without reductions for the plaintiff's child's no longer being a minor. 284 S.W.3d at 369, 373–77, 380. It did, however, bar injunctive or declaratory relief that focused backwards in time to the alleged "date of the illegal act," when the officials first changed the benefits formula. *Id.* at 369, 380.

20

### B.

In K.E.'s suit, Declarations 2 and 7 seek retrospective relief—declarations about the University officials' having act*ed* without authority and having violat*ed* due process in their proceedings. A court may not award K.E. freestanding declarations on these topics because they apply only to past, completed acts. Those two declarations, then, are like the immunity-barred ones in *American YouthWorks* because they seek only to alter or declare the unlawfulness of past acts. *See* 496 S.W.3d at 265–66.

So too with Injunction 2 and the first portion of Injunction 3, which ask that the trial court "declare" that past actions by all the University officials, and by the registrar individually, deprived her of certain rights. These requested injunctions look only backwards to declare the alleged unlawfulness of past acts, so they are barred by immunity. *See Heinrich*, 284 S.W.3d at 369, 373–77, 380; *American YouthWorks*, 496 S.W.3d at 265–66.

The rest of the injunctions are different. Injunction 1, about reinstatement and the removal of any revocation notation, and the second and third portions of Injunction 3, about the same topics but aimed at the registrar, are prospective because they concern future matters as "measured from the date of injunction." *See Heinrich*, 284 S.W.3d at 376.

Those remedies are prospective even if Declarations 2 and 7, as stand-alone declarations, are themselves retrospective. Even if K.E. would have to prove that TSU does not have the authority to revoke a degree, a claim mirroring the remedy sought in Declaration 2, or that the University officials revoked her degree by proceedings that violated due process, a claim mirroring the remedy sought in Declaration 7, those are *ultra vires* claims that may lead to the prospective-only remedies sought by Injunction 1 or by the second and third portions of Injunction 3. They are thus like the *Heinrich* plaintiff's need to prove the claim that the officials

21

miscalculated her benefits in the past to be entitled to an injunction ordering them to calculate correctly in the future. This was a permissible combination of claim and remedy even though immunity otherwise barred the *Heinrich* plaintiff from injunctive or declaratory remedies that, standing on their own, declared that the past benefits calculations had been incorrect.

I would sustain the University officials' first issue only in part and dismiss the requests for Declaration 2, Declaration 7, Injunction 2, and the first portion of Injunction 3.

## CONCLUSION

Whether implied by statute or inherent in university status, TSU's Board has the authority to revoke a degree for academic dishonesty. That authority has constitutional due-process limits and may have other limits not raised here. So while K.E.'s authority-to-revoke claims should be dismissed, her due-process claims should be heard in court. Because the majority opinion and judgment conclude otherwise, I respectfully dissent.

K.E. otherwise seeks some retrospective remedies that are barred by sovereign immunity, which I would dismiss. Because the majority opinion and judgment do not do so, I respectfully dissent in part. But I concur in the conclusion that the rest of K.E.'s claims are prospective and, on that score, safe from sovereign immunity.

I respectfully concur in part and dissent in part.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Filed: September 4, 2020

22